ARNOLD, Respondent, vs. INGRAM, imp., Appellant.

*October 10, 1912—January 7, 1913.*

*Libel: Liability of person delivering article for publication: What statements libelous: Privilege: Comment on candidates for office: Questions for court and for jury: Meaning of words: Publication to be considered as a whole: Malice: Burden of proof: Excessive publication.*

1. One who delivers a libelous article to a newspaper for publication, with knowledge of what it contains, is responsible for the publication thereof.

2. To render an alleged libelous publication actionable, the defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If they are merely general statements or comments, reflecting on no particular individual, no averment or innuendo can make them defamatory.

3. A publication in the nature of an appeal by one elector to others to overthrow a ruling political clique and all who adhere to it, which imputes to its candidates no crime and employs toward them no degrading or insulting epithets, but denounces them in extravagant language as unfit for office, unworthy of public confidence, and derelict in their duties, does not go beyond the bounds of fair comment and criticism and is privileged.

4. Thus, a statement in such a publication, describing plaintiff as a candidate for whom a self-respecting man could not vote, will not support a recovery in libel.

5. Where the most specific and serious accusations made in the alleged libelous publication against plaintiff, a candidate for office, are found by the jury to be true, and others, found to be untrue, are in the nature of conclusions or argumentative inferences as to his fitness for office, the protection of privilege must be accorded to the whole.

6. The qualified privilege to discuss the relative demerits of a candidate for office is broader than the mere right of fair comment and criticism applicable to a book, a play, or other similar thing offered to the public.

7. In libel, words are to be understood according to their plain and natural import, and where there is no ambiguity in the language its meaning is for the court to determine.

8. The court also determines whether the case was one affording a qualified privilege or the right of fair comment and criticism.

9. The question of malice is for the jury; also the question of the meaning of the alleged libel when the words used are ambigu-

ous or fairly susceptible of a libelous meaning, the question being as to how they were understood by the persons to whom they were originally published.

10. Defendant is entitled to have the alleged libel considered as a whole and not in isolated passages.

11. When a *prima facie* case of privilege has been made out by proof that the publication charged as libelous was made from a sense of public duty and with an honest belief in its truth, it then devolves upon the plaintiff to prove actual malice by some facts tending to show a malicious or guilty motive,—failing which, he cannot recover.

12. Although a newspaper article would be actionable but for the qualified privilege of discussing plaintiff's fitness for a county office, any excessive publication arising from the fact that the newspaper had some circulation outside the county is merely incidental and, in the absence of malice, gives no right of action.

BARNES, J., dissents.

APPEAL from a judgment of the circuit court for Eau Claire county: E. W. HELMS, Judge. *Reversed.*

The appeal is by the defendant *O. H. Ingram* from a judgment rendered against both defendants for $525 damages and $277.28 costs. The facts are fully stated in the opinion.

For the appellant there were briefs by *L. A. Doolittle,* attorney, and *Bundy & Wilcox,* of counsel, and oral argument by *Mr. Doolittle* and *Mr. C. T. Bundy.* Upon the question of excessive publication they cited 25 Cyc. 387; *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, 20 L. R. A. N. s. 361; *Redgate v. Roush,* 61 Kan. 480, 59 Pac. 1050; *Mertens v. Bee Pub. Co.* 5 Neb. (Unof.) 592, 99 N. W. 847; *Hatch v. Lane,* 105 Mass. 394; *Shurtleff v. Stevens,* 51 Vt. 501; *Fahr v. Hayes,* 50 N. J. Law, 275, 13 Atl. 261; *Sheftall v. Central of Ga. R. Co.* 123 Ga. 589, 51 S. E. 646; *Pittard v. Oliver,* [1891] 1 Q. B. 474; *Padmore v. Lawrence,* 11 Ad. & El. 380; *Brow v. Hathaway,* 13 Allen, 239; *Davies v. Snead,* L. R. 5 Q. B. 608; *Dale v. Harris,* 109 Mass. 193. As to privilege and the necessity of proving actual malice they cited, among other cases, *State v. Balch,* 31 Kan. 465, 2 Pac. 609;

*Wilson v. Noonan,* 35 Wis. 321, 349; *Rude v. Nass,* 79 Wis. 321, 325, 48 N. W. 555; *Karger v. Rich,* 81 Wis. 177, 51 N. W. 424; *Brown v. Vannaman,* 85 Wis. 451, 455, 55 N. W. 183; *Joseph v. Baars,* 142 Wis. 390, 125 N. W. 913; *Briggs v. Garrett,* 111 Pa. St. 404, 2 Atl. 513; *Hamilton v. Eno,* 81 N. Y. 116, 122; *Wright v. Woodgate,* 2 Cromp. M. & R. 577; *White v. Nicholls,* 3 How. 266, 287; *Jenoure v. Delmege,* [1891] App. Cas. 73, 78; *Bays v. Hunt,* 60 Iowa, 251, 14 N. W. 785; *Carpenter v. Bailey,* 53 N. H. 590; *Jackson v. Pittsburgh Times,* 152 Pa. St. 406, 25 Atl. 613; *O'Rourke v. Lewiston D. S. P. Co.* 89 Me. 310, 36 Atl. 398; *Miner v. Detroit P. & T. Co.* 49 Mich. 358, 13 N. W. 773; *Lewis v. Chapman,* 16 N. Y. 369; *Fowles v. Bowen,* 30 N. Y. 20; *Ross v. Ward,* 14 S. Dak. 240, 85 N. W. 182; *Hemmens v. Nelson,* 138 N. Y. 517, 34 N. E. 342; *Marks v. Baker,* 28 Minn. 162, 9 N. W. 678; *Henry v. Moberly,* 23 Ind. App. 305, 51 N. E. 497; *Laing v. Nelson,* 40 Neb. 252, 58 N. W. 846; *Howard v. Thompson,* 1 Am. L. C. (5th ed.) 175, 193 (21 Wend. 319, 34 Am. Dec. 238); *King v. Patterson,* 49 N. J. Law, 417, 9 Atl. 705; *Wright v. Lothrop,* 149 Mass. 385, 21 N. E. 963; *Palmer v. Concord,* 48 N. H. 211.

For the respondent there was a brief by *V. W. James* and *Fred Arnold* in person, attorneys, and *T. D. Sheehan,* of counsel, and the cause was argued orally by *Mr. James.* They cited, among other authorities, *Smith v. Utley,* 92 Wis. 133, 65 N. W. 744; *Adamson v. Raymer,* 94 Wis. 248, 68 N. W. 1000; *Nehrling v. Herold Co.* 112 Wis. 558, 88 N. W. 614; *Burt v. Advertiser N. Co.* 154 Mass. 238, 28 N. E. 1; *Bearce v. Bass,* 88 Me. 521, 34 Atl. 411; *Tawney v. Simonson, W. & H. Co.* 109 Minn. 341, 124 N. W. 229; *Pfister v. Milwaukee Free Press Co.* 139 Wis. 627, 121 N. W. 938; *King v. Root,* 4 Wend. 113, 114; *Joseph v. Baars,* 142 Wis. 390, 125 N. W. 913; *Driessel v. Urkart,* 147 Wis. 154, 157, 132 N. W. 894; *Shurtleff v. Parker,* 130 Mass. 293; *Upton v. Hume,* 24 Oreg. 420, 33 Pac. 810; *McAllister v. Detroit Free Press Co.*

76 Mich. 338, 43 N. W. 431, 15 Am. St. Rep. 318 and note; *Bradley v. Cramer,* 59 Wis. 309, 312, 18 N. W. 268; *Hamlin v. Fantl,* 118 Wis. 594, 95 N. W. 955; *Smith v. Burrus,* 106 Mo. 94, 16 S. W. 881; *Belknap v. Ball,* 83 Mich. 583, 47 N. W. 674; *State v. Haskins,* 109 Iowa, 656, 80 N. W. 1063, 47 L. R. A. 223; *Buckstaff v. Hicks,* 94 Wis. 34, 68 N. W. 403.

The following opinion was filed October 29, 1912:

TIMLIN, J.   In this action for libel against the appellant and one Granville Ross Pike it appeared that the latter was a clergyman who delivered a political sermon or discourse and sent a synopsis of it for publication to the Daily Telegram, a newspaper printed and published in the city of Eau Claire, another to the Eau Claire Leader, a like newspaper.   There was evidence tending to show that the appellant in person delivered the manuscript of this synopsis to the publisher of the Daily Telegram, who published the same, and the jury so found, but found that the appellant did not deliver the manuscript of the synopsis of the sermon in question to the Eau Claire Leader.   Only the defendant *Ingram* appeals.

The alleged libelous article is as follows:

"From the text Ps. 12:8, 'The wicked walk on every side, when the vilest men are exalted,' the Rev. Granville Ross Pike spoke yesterday morning at the First Congregational Church, on 'The Kakarky of Eau Claire.'   He said in part:

"In one of the banks of this city is a most ingenious invention, which indicates what the weather is to be by means of an automatic pen controlled by the rising or falling of the mercury in the glass tube of the barometer.   The record made is permanent, and the fluctuations of the weather may thus be read backward through months and years.   Just such an automatic pen is the history of mankind.   It records faithfully the fair weather of liberty or the foul weather of enslavement, according as the free spirit of a people has waxed or waned in their political institutions.   'Man,' says Aristotle, 'is by nature a political animal, and has endured or created every conceivable form of government.'   He has suffered under mon-

archy, or the government by one; under oligarchy, or the government by a few; under anarchy, or no government at all. A measure of his progress in civilization and true development is found in the degree to which he approaches a real democracy or that mutual government succinctly described in Lincoln's classic phrase: 'A government of the people, by the people, and for the people.'

"Under whatever form of government the people might lie, so dominant is the selfish impulse in human nature, they have always been forced to contend with those who have seized supremacy for the sake of personal gain. The passage just read from the prophet Isaiah is a striking indictment of such an instance and its results in ancient Israel. Our text describes a similar condition and its consequences at a still earlier date. It is therefore one of the oldest and at the same time one of the newest usurpations of the rights and liberties of the commonwealth, to which I direct your attention this morning, in a consideration of The Kakarky of Eau Claire.

"At the present moment we here in Eau Claire are enduring the reign of a Kakarky, a government by the bad. We fondly imagine that we have elected by our free suffrages certain city officials to administer the affairs of the city honestly, economically, equably, and with due regard to decency and order, and that these officials are doing that which they have been elected or appointed to do. This, however, is an altogether mistaken notion. The real rulers of Eau Claire today are a clique of seventy-three men, who have no official place of authority, no fitness for such a position, and no respect from much the larger proportion of our citizens. We flatter ourselves that it is the men whose enterprise and industry have created the wealth and industrial and commercial prosperity of the city, the men whose moral probity and high standards have given Eau Claire a character for splendid citizenship among the municipalities of the state, men whose patriotic zeal and self-denying generosity toward the city of their habitation have built her institutions of learning, of mercy, and of justice, are those whose will shapes our municipal policy and determines the influences which surround the childhood, the womanhood, and the common manhood of our city. It is not so. The actual sovereigns of this city are the seventy-three men, sixty-eight retail saloonkeepers and

five wholesale liquor dealers, whom our culpable acquiescence. has permitted to become enthroned as the dictators of the conditions under which we must live, transact our business, and bring up our children.

"The extent of their dominance is not generally recognized; if it were we would be roused to a revolt, which would sweep away utterly and at once that 'covenant with death and agreement with hell,' as Isaiah calls it, which, 'for a paltry forty-four thousand dollars, we have been seduced into making. Think a moment upon the measure of our subserviency. First, this monstrous autocracy has its hand in every business man's pocket, filching tribute under threat of boycott and antagonism. The Street Fair, just closed, is merely the latest, not the chief, instance of this. I asked business men if the Street Fair was of any advantage to them. One man said it had brought certain patrons of his to town and they had taken that occasion to settle their bills with him. This was the only favorable word that I heard. The others all declared it to be no help to trade; some called it a detriment to business, while still others declared that they would gladly have given twice as much to prevent the Fair coming, as they felt compelled to give to carry it on. Why, then, did all these merchants contribute? Because the seventy-three sent out word that they wanted the Street Fair and expected the business men of the town to largely finance it. Business is prostituted by the will of the saloonkeeper.

"The holiest sanctuary of a commonwealth is its law. This group of seventy-three rulers tramples with contempt upon the divine law of the Sabbath, written alike in the sacred decalogue and the still more sacred constitution of man; it spurns the statutes of Wisconsin, which declare that you shall do no business upon Sunday, except works of necessity or mercy, by systematically and persistently plying a nefarious trade, for which there is no necessity and in which there is no mercy; it ignores the fundamental ordinances of our city government, which prohibit the sale of liquor on Sunday, and sells to whomsoever will buy.

"This insolent domination creates an atmosphere of lawlessness and real anarchy, in which evil flourishes and good withers away. The time was when tropical plants flourished and tropical animals roamed, where for ages have been un-

melting ice fields and all vegetation has perished in the strangling grasp of continuous Arctic cold. The historic Campagna of Rome has become, through neglect, so saturated with malaria that it is well nigh utterly unfit for human habitation. There is a deadly exhalation from these sinks of iniquity—the regal palaces of our sovereign lords—which, like the deadly choke-damp of the mines, asphyxiates the moral sense of the community and paralyzes the energies of its administration. (1) [Officials, under its benumbing influence, violate their oaths of office,] juries are hypnotized into the giving of unjustifiable verdicts, and I myself, within the past fortnight, have heard a shrewd attorney of this city conduct three successive schools for the instruction of malefactors with what ease and impunity they might violate the laws of the land and of this municipality.

"Moreover, under the deadly shadow of this deadly upas tree, called the saloon, which is the throne of our rulers' power, there have sprung up other evils, grossly detrimental to the peace and welfare of the community. In the spirit of lawlessness engendered by the brazen defiance of law by this dominant element, opportunity is found for Sunday horse-racing, Sunday baseball, Sunday tournaments, and kindred violations of the quiet and sanctity of the day, to the great demoralization of our population. The Sunday theaters, unknown in this city four years ago, have become a large factor in the perversion, especially of the young people of the community, houses of a sort unfit to be named in decent company are always and everywhere the concomitants of the saloon and of saloon-dominated territory; gambling is fostered, encouraged, and developed in the saloon. Sweep these away, let in the flood of public attention and public interest and the uprising of public wrath upon these hiding places of evil, and they will be drowned out and washed clean, and with them will disappear altogether some of these evils and the residue will be greatly minimized.

"The serious question for each of us is: How may this hellish *régime* be overthrown? It is a problem which has confronted every people and every state at intervals since the dawn of history. Xenophon, the Greek historian, tells us how Athens, the glory and crown of art, of literature, of philosophy, fell into the hands of thirty tyrants, who violated her

public offices and wholly reversed the principles and traditions which, in making her free, had made her great. Eight months the citizens endured this reign of the Thirty. They then arose and overthrew these despots, killing some and driving the rest into exile. The pages of English history inform us how our own forefathers, wearied by the oppression of the Stuarts, arose and cast them out, beheading one, and when the restored line made no improvement, repudiated the house of Stuart altogether and established another. Our own ancestors, when the mother country sought to exercise unlawful jurisdiction over these colonies, wrote and maintained their immortal Declaration of Independence. Our own contemporaries in many of our cities, disgusted by the brazen effrontery and gross abuse of power of ruling factions, have risen and put them down. Eau Claire may be cleared of this pestiferous Kakarky by a similar assertion of manhood on the part of her citizens. The time is at hand in which to do this. Ten days hence occurs the election. When the ballots shall fall as lightly

> 'As snowflakes on the sod,
>   Yet execute the freeman's will
> As lightning does the will of God,'

(2) [then will be opportunity to discriminate between those who have served the city and the community in public office, and those who have betrayed her]. (3) [The great danger is that the momentum of a Presidential ticket will carry with it into office those who are utterly unworthy of public confidence.] Partisanship in city affairs is the curse of city administration. There is no partisanship in the ranks of those whom, in the name of the home, the law, and the commonwealth the entire citizenship should rise up and hurl from their seats. (4) [Chicago is, even now, in the midst of such an attempt as we should make, to rid that city of the gang of those who, like our own Seventy-three, have purchased the privilege of plunder, by the nonpartisan election of a district attorney on an independent ticket, when neither party has provided a candidate for that office for whom a self-respecting man can vote.] (5) [If, in our city, you see a man in the office of district attorney, who has based his claim to re-election upon the ground that he saved the county money by re-

fusing to prosecute more than half the criminal cases which he was elected and paid to prosecute; *if you see an official who publicly, in the court room, apologizes for prosecuting the criminal at the bar and declares his personal disapproval of the law under which the defendant was arraigned; if you see an official who, in this city within the present year, has refused to prosecute a considerable number of cases so flagrant that when the judge before whom they were brought declared his intention to continue them the defendants at once pleaded guilty and were fined;* if you know an officer whose loyalty to this ruling clique is beyond question and whose fidelity to his oath of office is open to grave doubt, what matters it to you whether he disgraces the Republican or the Democratic ticket?] If you find a candidate for the office of sheriff, whom you know, from past actions and evidence, to be allied with this rule that must be overthrown, what bearing upon your vote in this matter should have the question of the national policy of protection or free trade? If you see men on either ticket, who, if elected, when this small but pernicious group of Seventy-three has been thrown out of the front door, will not allow them to sneak in at the back, does it matter which?

"On a wider field. If you can find among the candidates for the Assembly or for the Senate one who will stand for liberation rather than for further enslavement to this same dominant power that holds Eau Claire in its grasp, what need you care which party had the honor of placing such a man in nomination? The test of free suffrage is each man's liberty, without bondage to any, to vote for what and whom he considers right.

"Let the refreshing breeze of a nonpartisan ballot blow away the morally devitalized atmosphere which we have been breathing, replacing with the quickening ozone of righteousness (6) [this effluvia of corruption which is undermining our moral stamina and familiarizing our entire population with betrayal of trust in high places] (7) [and the practice of wickedness in low, until it is demonstrated anew before our own eyes, that the wicked indeed walk, or, as the original reads, 'Strut proudly on every side, when vileness is exalted among the sons of men']."

The whole synopsis of the sermon as above printed is an-
nexed to the complaint and part thereof.   The headlines may
be disregarded because it appears they were put on after the
synopsis was delivered by appellant.   That part of the com-
plaint relating to publication in the Eau Claire Leader may
be omitted because it was found that the appellant did not
cause that publication.   The matter inclosed in bracket
No. (1) is also separately stated in the same complaint with
an innuendo to the effect that it was intended and understood
to assert as a fact that the plaintiff had under corrupt in-
fluence violated his oath of office.   By answer to question 5
of the special verdict the jury found that a person of average
comprehension, upon reading these words in connection with
the remainder of the synopsis as published, would ordinarily
have understood that the plaintiff was accused thereby of hav-
ing under corrupt influence violated his oath of office.   By
their answer to question 15 of the verdict they found that this
accusation was not substantially true.   The matter inclosed
in bracket No. (2) was also separately stated in the same
complaint with an innuendo to the effect that it meant and
was understood to mean that plaintiff had betrayed the trust
of the office of district attorney.   The jury in answer to ques-
tion 6 of the verdict found that a person of average compre-
hension, reading these words in connection with the remain-
der of the synopsis, would ordinarily have understood there-
from that the plaintiff was accused of betraying the trust of
his office as district attorney; and by their answer to question
No. 16 of the special verdict found that this accusation was
not substantially true.   The matter inclosed in bracket
No. (3) was also separately stated in the same complaint with
an innuendo to the effect that this meant and was understood
to mean that the plaintiff was in fact unworthy of public con-
fidence to any extent.   The jury in answer to question 8 of
the verdict found that a person of average comprehension,

reading these words with the rest of the synopsis, would ordinarily have so understood it, and by their answer to question 18 of the verdict found that this accusation was not substantially true. The matter inclosed in bracket No. (4) was also separately stated in the same complaint with an innuendo to the effect that it meant and was understood to mean that the plaintiff was in fact so base and vile that a self-respecting man could not vote for him. The jury in answer to question 9 of the verdict found that a person of average comprehension would not ordinarily so understand it, and although the question of the truth or falsity of this was submitted to the jury by question 19 of the verdict they did not answer it. The matter inclosed in bracket No. (5) is also separately stated in the same complaint with an innuendo to the effect that it meant and was understood to mean that each of the several charges and matters therein stated were disgraceful facts. The jury by their answer to question 1 of the special verdict found that that part of the matter in bracket No. (5) printed in ordinary type and preceding the italics would by a person of average comprehension, reading the synopsis of the sermon as published, have been understood to accuse the plaintiff of basing his claim to re-election upon the ground that he saved the county money by refusing to prosecute more than one half of the criminal cases which he was elected and paid to prosecute. By their answer to question 11 the jury found that this accusation was not substantially true. By their answer to question 2 of the special verdict the jury found that a person of ordinary comprehension, reading the synopsis in question as published, would ordinarily have understood that the plaintiff was accused thereby of having publicly in the court room apologized for prosecuting a criminal at the bar and declaring his personal disapproval of the law under which the defendant was arraigned. But by their answer to question 12 of the verdict the jury found that it was substantially true that the plaintiff had publicly in the court room apolo-

gized for prosecuting the criminal at the bar.    By their answer to question 12½ of the verdict the jury found that it was substantially true that the plaintiff had publicly in the court room declared his disapproval of the law under which the defendant was arraigned.    By their answer to question 3 of the verdict the jury found that a person of ordinary comprehension, reading the synopsis, would understand therefrom that the plaintiff, *as district attorney in the year 1908, refused to prosecute a considerable number of cases so flagrant that when the judge before whom they were brought declared his intention to continue them the defendants at once pleaded guilty and were fined.*    By their answer to question 13 of the verdict the jury found that the accusation last stated was substantially true.    That part of the synopsis contained in bracket No. (5) and which was found to be true is in italics above.    By their answer to the fourth question of the verdict the jury found that a person of ordinary comprehension would ordinarily have understood that the plaintiff was thereby accused of being an officer whose loyalty to the ruling clique of seventy-three liquor dealers was beyond question and whose fidelity to his oath of office was open to grave doubt.    By their answer to question 14 of the verdict the jury found that this accusation was not substantially true. The matter inclosed in bracket No. (6) is also separately stated in the complaint with an innuendo in effect charging that it meant and was understood to mean that the plaintiff had in fact and through said corruption betrayed the trust of his said office.    The jury found in their answer to question 7 that a person of average comprehension would so understand it, and in their answer to question 17 that the accusation was not substantially true.    The matter inclosed in bracket No. (7) is also separately stated in the same complaint with an innuendo to the effect that it was meant and understood to charge that the plaintiff was the vilest of men and that in him vileness was in fact exalted among the sons of men.    The

jury by their answer to question 10 of the special verdict found that a person of average comprehension would not ordinarily so understand it, and returned no answer to question 20, which asked whether this charge was substantially true.

With reference to the whole article the jury found by their answer to question 23 that the appellant in person delivered the manuscript of the synopsis to the office of the Daily Telegram on October 27, 1908, and by answer to question 24 that the appellant, when he so delivered said manuscript, had knowledge of the statements therein referring to the plaintiff. The answer to question 32 established that the defendant Granville Ross Pike was not actuated by any ill-will, hostility, bad motive, or malicious feeling against the plaintiff in the publication of the synopsis of the sermon in question. The answer to question 33 found that the appellant, in delivering the manuscript for such publication, was not actuated by any ill-will, hostility, bad motive, or malicious feeling against the plaintiff. For the publication in the Eau Claire Leader, with which the appellant was not concerned, the jury assessed compensatory damages against the defendant Granville Ross Pike, by their answer to question 21 of the verdict, in the sum of $600. For the publication in the Daily Telegram, with which the appellant was concerned as aforesaid by delivering the manuscript for publication having knowledge of its contents, the jury assessed compensatory damages against Granville Ross Pike in the sum of $525. Punitory damages assessed were not allowed, and no question is made concerning the correctness of that ruling. No damages were expressly assessed by the verdict against the appellant, but against the defendant Granville Ross Pike in the form stated, and the defendant was only connected with this by the finding that he delivered the manuscript in question to the newspaper office with knowledge of the statements therein contained referring to the plaintiff.

It is argued that appellant's participation in publication of the alleged libel is not sufficiently established. "Every one who requests or procures another to write, print, or publish a libel, is answerable as though he wrote, printed, or published it himself." Odgers, Libel & S. (5th ed.) 168. "The mere delivery of a libel to a third person by one conscious of its contents amounts to a publication." Id. 165. Instances illustrating the application of this general rule may be found in 25 Am. & Eng. Ency. of Law (1st ed.) 820, 821, 27 Am. & Eng. Ency. of Law (2d ed.) 1056, where a telegraph company is held responsible for publishing a libel in transmitting a telegram from the sender to the person addressed. Also *Monson v. Lathrop,* 96 Wis. 386, 71 N. W. 596; *Peterson v. W. U. Tel. Co.* 65 Minn. 18, 67 N. W. 646. In *Loibl v. Breidenbach,* 78 Wis. 49, 47 N. W. 15, it is held that one who negligently signs a libelous article without knowing its contents and delivers it to the person who wrote it without any direction restricting the use to be made of it, is responsible for the publication thereof by the person to whom it is delivered, where the article shows on its face that it is intended for publication. Participation in publishing a libel is participation in the commission of tort, and the old and well known rule is that all who aid, advise, countenance, or assist the commission of the tort are wrongdoers.

The most serious question raised by the appeal is the claim of qualified privilege on the ground that the plaintiff was a candidate for public office and his official acts and public character open to discussion, and therefore the article in question, so far as it concerns the plaintiff, did not exceed the bounds of fair comment and criticism. The alleged libelous matter is set forth in full in this opinion because we found it impossible by mere description to convey an accurate idea of the nature and contents of the synopsis. It is purely political, such a discourse as one often hears on the stump from politicians or public men during an election campaign. The

authority of Isaiah, Aristotle, and Abraham Lincoln is invoked, and the experience of Athens, Rome, and England drawn upon as a warning against the domination of the seventy-three saloonkeepers in Eau Claire. These seventy-three are the principal objects of attack, but all who adhere to them are also condemned and exposed. In presenting the seventy-three and their adherents for disapproval, the writer, for the purpose of impressing his readers or because of a personal peculiarity, employs some highly rhetorical and extravagant forms of expression. "A deadly exhalation from the regal palaces" of those whom he describes as sovereign lords of Eau Claire, which deadly exhalation is compared to the deadly choke-damp of the mines, is said to asphyxiate the moral sense of the community and paralyze the energies of its administration. Then follows the first alleged libelous statement complained of as above set forth. It does not refer to the district attorney nor to the plaintiff, but to all officials who come under the benumbing influence of this deadly exhalation and under such influence they violate their oaths of office. "The defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo cannot make the person certain which was uncertain before." Newell, Slander & L. (2d ed.) p. 256, § 17. Illustration: If a man wrote that all lawyers were thieves, no particular lawyer could sue him unless there is something to point to the particular individual. *Eastwood v. Holmes,* 1 F. & F. 347, 349. This matter in bracket (1) refers to all officials and does not point to the district attorney or to the plaintiff any more than it does to the county judge, the mayor of the city, or any city or county officer. The matter in brackets (2) and (3) is subject to this same weakness. There is nothing to show that it points to the district attorney more than it does to any other officer,

unless it be the innuendo, which is not warranted by the context. The alleged libelous matter in brackets (1), (2), and (3) not only fails to point to the district attorney more particularly than to any other officer, but is in the nature of an appeal by one elector to the other electors to overthrow the ruling political clique and all who adhere to it. It relates to the fitness for office of those who adhere to the ruling clique and their conduct in office; it imputes no crime to them, it employs no degrading or insulting epithets toward them, but in extravagant language denounces them as derelict in the duties of their office, unfit, unfaithful, etc. This we understand a political stump orator may do, and outside of ethics there is no rule against using the pulpit for a like purpose. It would be absurd to hold it libelous to say of a candidate for office that he was utterly unworthy of public confidence. To maintain that proposition all political arguments are advanced against a candidate. They are sometimes very rambling, remote, and irrelevant, but the law does not undertake to punish the man who sums them up in a single sentence. The district attorney is introduced for the first time in the matter contained in bracket (4). Here we have it that a gang in Chicago similar to the seventy-three Eau Claire saloonkeepers purchased the privilege of plunder, a thing to be obviated by the nonpartisan election of a district attorney on an independent ticket when neither party had provided a candidate for that office for whom a self-respecting man could vote. We do not understand that there was any nonpartisan candidate for district attorney in Eau Claire or that the plaintiff was so described. He simply endeavors to bring himself within the last part of that sentence which states neither party has provided a candidate for the office of district attorney for whom a self-respecting man can vote. The plaintiff was the nominated candidate to the office of district attorney on the Republican ticket, and it may be fairly said that this part of the synopsis describes the plaintiff as a candidate

for whom a self-respecting man could not vote. This is all that is claimed for it in the complaint. The jury negatived any further libelous meaning attempted to be put on this by innuendo, if the innuendo really adds anything to it, and no other meaning was claimed for it on the argument, so we may say this drops out as a support for the recovery.

The matter inclosed in bracket (5) presents more difficulty. Although cast in a single sentence in the synopsis and this sentence set forth separately in the complaint, followed by an innuendo to the effect that it meant and was understood to refer to the plaintiff, and to assert in the form of a climax that each of the several charges and matters were facts, it was separated in the verdict. The jury found that part of it in italics above to be true, the remainder of the sentence not true. That part found to be true contains the most specific and serious accusations in the sentence. The parts found by the jury not to be true are also found by them to accuse the plaintiff of basing his claim to re-election upon the ground that he saved the county money by refusing to prosecute more than half of the criminal cases which he was elected and paid to prosecute. This merely finds that he made claim to re-election upon that ground. The other part of the same sentence was interpreted by the jury to charge the plaintiff with being an officer whose loyalty to the ruling clique of seventy-three liquor dealers was beyond question and whose fidelity to his oath of office was open to grave doubt. Taken in connection with the rest of the synopsis the fair interpretation of this, it seems to us, is that the matter found to be true by the jury formed the basis of the writer's conclusion that the plaintiff was loyal to the ruling clique of liquor dealers and that his fidelity to his oath of office was open to grave doubt. That appears to be an argumentative inference from the fact that he apologized for certain prosecutions, disapproved the law under which they were brought, and refused to prosecute others who nevertheless pleaded guilty and were fined.

The matter in bracket (6) was found by the jury to present
to a person of average comprehension, on reading the synop-
sis, the idea that the plaintiff was accused of having through
effluvia of corruption betrayed the trust of his office as district
attorney.   It does not seem to us to refer to the plaintiff.
Its meaning is not very apparent.   The writer had just be-
fore been discussing candidates for Assembly and for Senate.
The article speaks for itself on this point.   He wishes the
refreshing breezes of a certain ballot to blow away the mor-
ally devitalized atmosphere which they have been breathing,
and he wishes to replace an effluvia of corruption (which was
undermining their moral stamina and familiarizing them
with betrayal of trust in high places) by the quickening ozone
of righteousness.   This is another attempt to break up a sen-
tence into fragments and give an independent meaning to
each fragment.   The matter in brackets (6) and (7) seems
to us to be a sort of a pious peroration closing the argument.
It is noticeable that the jury found that that part of this sen-
tence inclosed in bracket (7) would not bear the libelous con-
struction placed upon it by the innuendo in the complaint.
Considering the last sentence in the synopsis we think it could
not be fairly said that one discussing political questions from
the viewpoint of the Reverend Mr. Pike exceeded the bounds
of fair comment by indulging in such generalities.   This
matter in brackets (6) and (7) is not reasonably susceptible
of any defamatory meaning so far as the plaintiff is con-
cerned.   Indeed the whole synopsis is directed against the
seventy-three liquor dealers and their adherents, including all
other public officers who adhere to them or their cause, except
where he takes up the district attorney in brackets (4) and
(5).   The matter contained in bracket (4) having been
found by the jury not libelous, the whole case really rests
upon the matter contained in bracket (5).   If part of this
last had not been found true by the jury a very different
question would be presented.   The occasion being one of

qualified privilege, and the more serious matters in the synopsis, so far as they refer to the plaintiff, having been found by the jury to be true, and those related matters in the same sentence being in the nature of conclusions resting in part or in whole on the matter found to be true, the protection of privilege must be accorded to the appellant.   In the law of libel that branch or subdivision of qualified privilege which permits discussion of the relative merits and demerits of candidates for office is not identified with the defense of fair comment and criticism of a book, a play, or other similar thing offered to the public.   But the qualified privilege to discuss the relevant demerits of a candidate for office is broader and includes privilege as well as the right of fair comment and criticism.

In libel words are to be understood according to their plain and natural import.   Where there is no ambiguity in the language its meaning is for the court to determine.   Odgers, Libel & S. (5th ed.) p. 688, par. 6.   The court also determines whether the occasion was one affording to the writer a qualified privilege or right of fair comment and criticism. Newell, Slander & L. (2d ed.) p. 391, § 9.   The question of malice is for the jury, and also the question of the meaning of the alleged libel when the words used are ambiguous or fairly susceptible of a libelous meaning.   The question always is: How did the persons to whom the words were originally spoken or published understand them?   In answering this question it is the duty of the jury to weigh all the circumstances of the case, the occasion of speaking, and the relationship between the parties.   They should consider the words as a whole, not dwelling on isolated passages, but give its proper weight to every part. . . . The defendant is therefore entitled to have the whole of the alleged libel read as part of the plaintiff's case, and, for the purpose of showing that what he wrote was not libelous and will not bear the construction which plaintiff seeks to put upon it, may give in evidence any

other passages in the same publication which plainly refer to the same matter or which qualify or explain the passage sued on. Newell, Slander & L. (2d ed.) pp. 304, 305, §§ 28, 29.

The scope of questions 32 and 33 of the special verdict is very broad. Neither defendant was actuated by any ill-will, bad motive, or malicious feeling against the plaintiff. The negation of bad motive is equivalent to a finding of good faith, so that we may say it is a verity that the synopsis, such as it is, was published in good faith and without malice. The occasion was one of qualified privilege. The publication was made in good faith and without malice. There was no accusation of crime contained therein and no gibes, taunts, or insulting epithets tending to bring the plaintiff into public contempt or ridicule. The extravagant expressions contained in the publication relating to the manner of performance of official duty and to the qualifications and reliability of the candidates, so far as they applied to the plaintiff, by reason of the finding of the truth of a substantial part of the synopsis and the privilege of the occasion, made no case for recovery against the appellant.

"Every citizen has a right to comment on those acts of public men which concern him as a citizen of the state, if he do not make his commentary a cloak for malice· and slander. Those who fill a public position must not be too thin-skinned in reference to comments made upon them. It would often happen that observations would be made upon public men which they knew from the bottom of their hearts were undeserved and unjust; yet they must bear with them and submit to be misunderstood for a time, because all knew that the criticism of the press was the best security for the proper discharge of public duties." Newell, Slander & L. (2d ed.) p. 577, § 15.

It is said in *Buckstaff v. Viall*, 84 Wis. 129, 54 N. W. 111, that a privileged communication is a fair comment by a public journal upon a matter of public interest. But gibes, taunts,· and contemptuous and insulting ·phrases are not a fair

comment nor privileged by any principle of law. It was said by Chief Justice Dixon in *Calkins v. Sumner,* 13 Wis. 193, that to support an action for verbal or written slander it is necessary that the charges should be false and that they should be maliciously made.

"When the *prima facie* case of privilege has been thus made by proof that the communication was made in the course of a public duty, from a sense of public duty, and with an honest belief in its truth, it becomes the duty of the plaintiff, as in other cases of communications conditionally privileged, to prove actual malice by some facts tending to prove a malicious or guilty motive." *Joseph v. Baars,* 142 Wis. 390, 125 N. W. 913.

"The exemption from liability for words spoken on a privileged occasion is not the same privilege recognized in the law as pertaining to confidential communications, as between attorney and client and other like confidential relations, but they are privileged upon the ground that they furnish no ground of action for alleged injury." *Schultz v. Strauss,* 127 Wis. 325, 106 N. W. 1066.

It is contended by respondent's counsel that even if the publication was privileged in Eau Claire county, in which the electors were interested in the qualifications of the candidate, evidence shows that the newspaper had some circulation outside of that county and therefore there was an excessive publication within the rule of *Buckstaff v. Hicks,* 94 Wis. 34, 68 N. W. 403. This rule relating to excessive publication applies more strictly to cases in which privilege is claimed on the ground that the communication was private and confidential and from one having an interest in, or duty relating to, the subject of the communication to another having a like interest or duty. But it is also applied, as shown in *Buckstaff v. Hicks, supra,* to cases where the interest is more public although not generally public. When we come to the application of the rule to the instant case it will be found there are no charges in the synopsis to which it applies. It cannot apply to those which do not designate the plaintiff, nor to

those which the jury found not ordinarily susceptible of the libelous meaning attempted to be put on them by the innuendo, nor to those which are found to be true, nor to those which are mere argumentative inferences from the latter. If we assume that some expressions in bracket (5) of the synopsis not found to be true would have been actionable but for the privilege of discussing the relevant demerits of a candidate for office, then the alleged excessive publication was merely incidental, and coupled with the finding of good faith and lack of malice gave no right to recover damages, within the rule of *Coleman v. MacLennan,* 78 Kan. 711, 98 Pac. 281, 20 L. R. A. n. s. 361; *Hatch v. Lane,* 105 Mass. 394; *Shurtleff v. Stevens,* 51 Vt. 501.

*By the Court.*—Judgment reversed, and the cause remanded with directions to render judgment for appellant.

BARNES, J. (*dissenting*).   By question 4 of the special verdict the jury found that a person of average comprehension, upon reading the synopsis of the sermon as published, would have ordinarily understood that the plaintiff was accused in said sermon of being an officer whose loyalty to the ruling clique of seventy-three retail and wholesale liquor dealers mentioned in the sermon was beyond question and one whose fidelity to his oath of office was open to grave doubt.

Question 5 of the special verdict was as follows:

"Would a person of average comprehension, upon reading the words 'officials under its benumbing influence violate their oaths of office,' and considering these words in connection with the remainder of the synopsis of said sermon as published, ordinarily have understood that plaintiff was accused by said words in said sermon of having, under corrupt influence, violated his oath of office?"

To which question the jury answered "Yes."

By the answer to the fifteenth question the jury found that it was not substantially true that the plaintiff had under corrupt influence violated his oath of office.

By its answer to question 14 the jury found that it was not substantially true that the loyalty of the plaintiff to the ruling clique of seventy-three retail and wholesale liquor dealers was beyond question, or that his fidelity to his oath of office was open to grave doubt.

I think that the jury was warranted in answering the fourth, fifth, fourteenth, and fifteenth questions as they did. It was charged that the loyalty of the plaintiff to the ruling clique of seventy-three liquor dealers was beyond question and not only that his fidelity to his oath of office was open to grave doubt, but that he in fact violated such oath by reason of the corrupt influence exercised over him by the saloon-keepers in question. These charges were false but not maliciously made. I cannot assent to the doctrine that in the absence of malice any person can make and publish of and concerning a candidate for office untrue charges such as the foregoing and escape responsibility for them on the ground of "qualified privilege." Candidates for office should not be treated as pariahs who can with impunity be charged with grave crimes, albeit those charges are in somewhat general terms. They are just as harmful as though they were made specific enough to satisfy the demands of a criminal pleading. It would be a misnomer in fact and in law to call the article "fair comment," in view of the fact that the jury found that the most flagrant charges contained therein were untrue.

The respondent moved to modify the mandate of this court by striking therefrom the direction to render judgment in favor of the appellant and substituting a direction to the circuit court to permit and take such further proceedings in the cause, consistent with the opinion of this court, as to said circuit court may seem proper and according to law, "and in such other particulars as may be essential to the preservation of the rights of the respondent."

The motion was denied, with $25 costs, on January 7, 1913.