GIWOSKY and another, Respondents, v. JOURNAL COM-
PANY, Appellant.

*No. 508 (1974). Argued October 28, 1975.—
Decided January 6, 1976.*
(Also reported in 237 N. W. 2d 36.)

1

For the appellant there were briefs by *James P. Brody, John R. Dawson* and *Foley & Lardner,* all of Milwaukee, and oral argument by *John R. Dawson.*

For the respondent there was a brief by *John P. Savage* and *Davis, Kuelthau, Vergeront, Stover & Leichtfuss, S. C.,* all of Milwaukee, and oral argument by *John P. Savage.*

ROBERT W. HANSEN, J. The plaintiff-respondent alleges that his business and reputation in the community were damaged in a series of radio-TV broadcasts over defendant-appellant's stations. The broadcasts, combining comment and interviews, were background-of-the-news features discussing both changing conditions in a

Milwaukee neighborhood[1] and the matter of "absentee landlords," meaning landlords who did not reside on the property they rented.[2] (The broadcasts took place between August 21, 1972 and August 30, 1972.) The plaintiff is engaged in the business of residential real estate rentals and is, therefore, an "absentee landlord."

Of the series of broadcasts on changed conditions in Milwaukee's east side, the plaintiff incorporates into his complaint the complete transcript of four broadcasts, an editorial comment, plus excerpts from a sixth and seventh broadcast. His complaint is that, in the one broadcast in which his name was mentioned, he was specifically defamed; and in the broadcasts incorporated in the complaint, viewed as a whole, he was defamed by inference. Plaintiff's brief on appeal begins with the statement: "The sole question before a court in a defamation case on demurrer is whether the allegedly-defamatory communication is *capable* of a defamatory meaning."[3] That is certainly the threshold question to be

[1] The first of the series of special feature broadcasts (August 21, 1972) began with the WTMJ announcer stating: "Milwaukee's East Side is a rapidly changing area with a lot of absentee landlords." Commentator James Baker continued: "The east side has had family orientated neighborhoods, but that's begun to change. With the growth of UWM there has been an increased demand in multiple housing units. Many of the houses here on the east side have converted from single family dwellings to multiple family dwellings." (Exhibit A)

[2] As to the reference to "absentee landlords," it is to be noted that the traditional residential pattern in Milwaukee was that of owner-occupied single family dwellings and duplex flats and small apartments in which the owner resided on the premises and rented other portions to other persons. Traditionally, even store owners and operators lived on the store premises, either behind or above the commercial part of the premises. A greater emphasis upon constructing multiple-dwelling units, and of converting single and two-family homes into multiple-dwelling units, can and has affected such basic or traditional housing pattern.

[3] Respondent's brief at page 6, citing: *Wozniak v. Local 1111 of U. E.* (1970), 45 Wis. 2d 588, 173 N. W. 2d 596; *Hoan v. Journal Co.* (1941), 238 Wis. 311, 298 N. W. 228; *Martin v. Outboard*

answered, and here, first, as to the broadcast in which plaintiff's name was mentioned and, secondly, in the seven broadcasts if such seven are to be considered as a linked or single entity.

The only broadcast that mentioned the name of the plaintiff was the broadcast of August 24th. Plaintiff contends that this single broadcast on August 24th "is itself capable of defaming Respondent." The transcript of the August 24th broadcast, incorporated into the complaint as Exhibit D, can be capsulized as follows:

*August 24, 1972.* The announcer introduced the report as the fourth in a series "about absentee landlords." The subject of the report was a house located on Milwaukee's east side and the unidentified family who lived there. The report noted that in May the owner of the property had been taken to court for a single housing code violation, stating: "The owner at that time was Daniel Giwosky who operates the Fox Bay Realty, 3575 North Oakland. At the first court appearance the case was postponed until August 4th, and on that date the case was dismissed because of compliance with the order." A picture of the house was shown, identified as: "Here's what some of the inside of this property looks like today." A letter from the new owner was read, beginning: "This is to inform you that I am the purchaser of the duplex in which you live, this is my first venture into real estate, . . ." and concluding by raising the rent. Identified in the letter as "my lendor" is the Fox Bay Company, at 3575 North Oakland, with the announcer noting that: "The former owner of that property was Daniel Giwosky, who operates Fox Bay Realty at 3575 North Oakland. Both have the same telephone listing. . . ."

*Marine Corp.* (1962), 15 Wis. 2d 452, 113 N. W. 2d 135; and adding: ". . . it is only if the words are incapable of a defamatory meaning, as a matter of law, that the demurrer may be sustained." Citing: *Frinzi v. Hanson* (1966), 30 Wis. 2d 271, 140 N. W. 2d 259; *Waldo v. Journal Co.* (1969), 45 Wis. 2d 203, 172 N. W. 2d 680.

No part of the August 24th broadcast is alleged by plaintiff to be false, but it is alleged that, in three respects, the August 24th broadcast was "grossly misleading." The first such respect is claimed to be that "the report makes it appear that it was Daniel Giwosky who requested a court adjournment at the first court appearance." The words broadcast convey no such meaning. All that is said is that there was a single adjournment. No mention is made of it being at request of either of the parties. It could have been ordered by the court. The second of the three "respects" concerns showing the picture of the house with the statement: "Here's what some of the inside of this property looks like today." But "today" was August 24, 1972, with the only reference to plaintiff being that he had owned the house three months earlier. The August 24th broadcast made clear that, not only was plaintiff not the owner "today," but that the one violation charged to him during his earlier ownership had been rectified and the complaint against him dismissed. The third respect on which a claim of defamatory meaning is based is the reference to "my lendor," mentioned by the new owner in the letter read on the broadcast, having the same address and telephone number as a company operated by plaintiff. No allegation is made that this statement is false, but it is claimed that the comments "falsely imply" that the sale by plaintiff to a new owner was "a sham designed to evade federal rent control." This is a strained construction and an unreasonable extension, and it suggests a reason for and result of the change of ownership that is not alluded to, directly or indirectly, in the broadcast.

With the threshold question of the possibility of a defamatory meaning being "generally raised on demurrer,"[4] we have no hesitancy in holding that the words in the August 24th broadcast were not "reasonably

[4] *Martin v. Outboard Marine Corp., supra,* footnote 3, at page 461.

capable of conveying a defamatory meaning to the ordinary mind,"[5] and that the meaning ascribed to such words in such broadcast by the plaintiff are not "a natural and proper one."[6] As to plaintiff's contention that the August 24th broadcast "is itself capable of defaming Respondent," we hold that such broadcast, by itself, cannot be considered defamatory or to have been so understood by an ordinary person with an ordinary mind.[7]

However, the plaintiff does not stop at contending that the August 24th broadcast, by and of itself, was defamatory. The previous day's broadcast on August 23d concluded with the statement: "Tomorrow a case in point." (Exhibit C) So plaintiff contends that this reference to what was to come constitutes a bridge, linking the August 24th broadcast to what went before. Each of the broadcasts was presented separately, orally, in a separate news program on a separate day. We do not here determine whether the separate broadcasts in this case are sufficiently tied together to justify the unitary approach of treating the series as a single communication.[8] We hold that issue to be a mixed question of law

[5] *Meier v. Meurer* (1959), 8 Wis. 2d 24, 29, 98 N. W. 2d 411.

[6] *Id.* at page 29.

[7] See: *Frinzi v. Hanson, supra,* footnote 3, at page 276. *See also: Woods v. Sentinel-News Co.* (1935), 216 Wis. 627, 629, 258 N. W. 166.

[8] See: *D'Amato v. Freeman Printing Co.* (1968), 38 Wis. 2d 589, 592, 157 N. W. 2d 686, where this court affirmed the overruling of a demurrer to a complaint which attempted to state several causes of action based on a number of separate but related newspaper publications occurring over a period of several weeks in time, our court stating: "The trial court may have been propelled toward the unitary approach by the fact that each cause contains in substance the following allegation '. . . that the said statement and the article in its entirety, were part and parcel of a continuing course of defamatory attack on the reputation of the plaintiff, which attack was extended over a period of time.' "

and fact to be raised as a matter of defense and determined at the time of trial. At demurrer stage, we accept the bridge or linking concept urged by plaintiff. This puts a heavy load on the bridging phrase, "Tomorrow a case in point," particularly where, as we have held, the August 24th broadcast concerned and dealt with the current status and condition of a building which was at one time but no longer owned by the plaintiff. Nonetheless, at demurrer stage, we will assume the bridge supports the load sought to be placed upon it.

However, here linking, to begin with, the August 24th broadcast with the preceding day's broadcast that ended "Tomorrow a case in point" adds no weight of substance to plaintiff's claim of cause of action. The transcript of that August 23d or day-preceding broadcast, incorporated into the complaint as Exhibit C, can be summarized as follows:

*August 23, 1972.* After stating that "Some people on the east side of Milwaukee have become concerned about absentee landlords, who *they say* buy up old properties, charge more rents than before, and don't keep the properties up," the announcer said that the Milwaukee East Organizing Committee "accuses" the department of housing inspection of not performing its duties, and: "The head of that department says this is not true." (Emphasis supplied.) The bulk of the broadcast consisted of the statement of the city building inspector, Matt Schimenz, dealing with the need for cooperation and stating that: "Unfortunately, in some of these cases of absentee landlords our local courts are not trying these cases on the theory that the attorney involved is a member of the bar and is an officer of this court, and they get an outside judge to come in. Unfortunately, these outside judges do not understand the situation in Milwaukee. There are entirely too many continuances granted and in many cases the fines are nominal and in many cases sentence is dismissed. . . ."

Even if the plaintiff were a licensed attorney-at-law, we see nothing in the reference by the building inspector as to continuances granted attorneys who are absentee landlords as being defamatory either to attorneys who are absentee landlords or as to absentee landlords who are not attorneys. The August 23d broadcast dealt primarily with attorney landlords. Nowhere in that broadcast or in this record is there any mention or suggestion that the plaintiff is an attorney-at-law. The April 23d reference to attorney-landlords was incapable of defaming plaintiff unless he were identified as being in the subgroup.[9] Even if he had been so identified, the building inspector did not criticize or defame attorney-landlords as a group or class. He attacked the rule or policy in Milwaukee county of circuit and county judges disqualifying themselves whenever an attorney is a party litigant, and having an outside judge called in to try the case. Whatever the soundness or lack of soundness of that court rule, it is clear that judges, not attorneys, were its author. With a continuance necessarily involved in the disqualification and calling in of an outside judge, criticism of the result is no more than a criticism of the rule. We hold, as a matter of law, that there was nothing in the August 23d broadcast that was defamatory of attorney-landlords as a class, or in any way defamatory of this plaintiff.

Lengthening the bridge of "Tomorrow a case in point" backwards to include the August 22d, or second broadcast, also adds nothing capable of a defamatory meaning

---

[9] See: De Witte v. Kearney & Trecker Corp. (1953), 265 Wis. 132, 137, 60 N. W. 2d 748, this court holding: "It is an elementary principle of the law of libel that certainty as to the person or persons defamed must appear from the words themselves." See also: Arnold v. Ingram (1913), 151 Wis. 438, 452, 138 N. W. 111, this court holding: " 'The defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. . . .' " (Quoting Newell, Slander & L. (2d ed.), p. 256, sec. 17.)

either towards the plaintiff or to "absentee landlords" as a group or class. The transcript of the August 22d broadcast, incorporated into the complaint as Exhibit B, can be capsulized as follows:

*August 22, 1972.* The commentator discussed the budget of the building inspector's office, noting that "[m]ost of the one hundred fifty building inspectors spend most of their time inspecting new construction," with "about sixty-five inspectors" taking care of the 260,000 dwelling units in the city. The building inspector was asked about an average homeowner's thinking that absentee landlords get special leniency. The city building inspector, Matt Schimenz, stated that such landlords are slow in responding in making corrections "often times because they feel that the violations are not of their doing, but that of the tenants; they have some marginal tenants." He then explained that his department sought "to be as reasonable as we can," and explained time involved as involving the right of property owners to appear before the board of standards and appeals, the court warning letter giving property owners eighteen to twenty days to make repairs, and entitlement to an adjournment on a first appearance in court. He added that, if the owner happens to be an attorney, ". . . it's going to be an outside judge who comes in. . . ."

Except for the explanation by the building inspector of the policy of reasonableness on the part of his department and the various time-involving steps in securing a correction of claimed code violations, there is nothing added to the plaintiff's claim of cause of action by adding the August 22d broadcast to that of August 23d and 24th. The building inspector did close by saying that "absentee landlords" did "know the law, they know how far they can go." That may not be appreciated flattery, but there is no possible defamatory implication in stating that a citizen, landlord or not, lawyer or

not, knows his rights under the law and exercises them. There might be implied some suggestion for a change in the law or procedures, but it is no defamation of any citizen to say he knows his rights and secures them under the law.

With the bridge of the "Tomorrow a case in point" reference extended to the beginning to include the first or August 21st broadcast, we still find no buttressing of plaintiff's claim of cause of action. The transcript of that August 21st broadcast, incorporated into the complaint as Exhibit A, can be summarized as follows:

*August 21, 1972.* The announcer stated that this would be "the first of a series of reports" on Milwaukee's east side as "a rapidly changing area with a lot of absentee landlords." The commentator stated that such changing condition "concerns a group of long time east side residents who call themselves the Milwaukee East Organizing Committee." He then introduced two members of that organization who gave short, individual statements. One group representative stated her opinion to be that it was wrong "[f]or the rent to be raised and for them [absentee landlords] to put nothing back into this property. . . ." Another representative of the group stated that income property was "being left to run down," and that one named landlord, not the plaintiff, ". . . keep[s] getting another two weeks to fix the property. . . ."

Since the commentator did no more than introduce the subject and note the fact of change, the claim that something capable of a defamatory meaning was stated on the August 21st or initial broadcast must refer to the statements made by the two ladies who spoke for the Milwaukee East Organizing Committee. But the only specific complaint they made as to leniency of treatment of landlords was as to a landlord named, who was not this plaintiff, and that complaint centered on a claimed court policy of granting continuance for the purpose of making repairs to correct code violations. We do not

see that statement as capable of a defamatory meaning to anyone, but, if it possesses such capability, the group involved or criticized would be the judges who grant the continuances. The plaintiff's claim of cause of action is not strengthened by citizen criticism, warranted or not, of a court policy of granting continuances in order that code violations can be corrected. We hold, as a matter of law, that what was said by the announcer and the citizen participants on the August 21st broadcast cannot in any manner or means be given a defamatory meaning as to this plaintiff.

While not incorporating into the complaint any of the series broadcasts that follow the August 24th broadcast, primarily relied upon, except for the editorial comment, the plaintiff does excerpt and set forth in his second amended complaint the following statement made during the August 29th broadcast. As stated in the complaint:

"5. On August 29, 1972, in that day's installment of the said series, WTMJ employee James Baker began the said installment thus:

" 'We've been talking a lot lately about absentee landlords who buy up houses as income properties, often raising the rents and not putting anything back into the properties, or as little as possible. But not all absentee landlords operate this way.' "

It is puzzling, and doubtful pleading practice, for the plaintiff to set forth in full the first four broadcasts and not do the same for the entire series since his contention is that the entire series of broadcasts ought to be treated as one communication and a single entity. Obviously, the excerpted portion of the August 29th broadcast, as well as one of similar tone in the August 30th broadcast, were set forth in the complaint to stress the "talking a lot lately about absentee landlords" reference. But even the reference here says only that such landlords "often" raise rents or put as little as possible back into properties. If there was any doubt about the

limited nature of the reference made and intended, it vanishes with the final sentence, "But not all absentee landlords operate this way." While the plaintiff here can be heard to correctly claim that he has been identified as an "absentee landlord," he cannot find any basis on this record and in the portions of the series he selects to quote for any contention that he was or has been identified as one of the sub-group of "absentee landlords" who "often" raise rents or fail to put anything back into their properties.

Finally, under his alternative argument that the portions of the series he quotes ought be considered along with the August 24th broadcast, in which he alone is mentioned, the plaintiff incorporates into his complaint an editorial comment, broadcast by station editorialist Edward Hinshaw on August 25th and 26th over both the radio and television stations of the defendant. Because it is brief, we set it forth in full, as incorporated into the complaint as Exhibit E:

*August 25 and 26, 1972.*
"A series of news reports this week indicates a serious problem here involving absentee ownership of income rental housing units.
"The problem is double-headed.
"The building inspection system cannot respond quickly to inadequacies in rental housing units.
"And, perhaps more importantly, some landlords find it financially more lucrative to pay court fines than to fix up.
"The solutions to the problem are, therefore, simple. Clear the legal way to speed up and improve building inspection. And, give the courts the power and duty to make things financially very hard on those few landlords whose trade is to deal in human misery."

Both as to diagnosis of the problem and prescription for cure, this is no more, and no less, than a statement of the editorial position of the radio-TV stations on the matter of absentee ownership of income

rental housing units. That criticism is of the present or existing system for dealing with claims of code violations. The twofold suggestion is that building inspection procedures be improved and that courts be given additional powers and duties in code enforcement situations. It is claimed that, under the present system, "some landlords" find it more profitable to pay fines than to make substantial repairs to their property. This is a fault of the system that leads to the suggestions made for its being improved. The reference to a "few landlords whose trade is to deal in human misery" is by no means a reference to all who own property and do not reside on their premises, and not at all a reference to the plaintiff who was identified in the entire series only once and solely as a former owner of a piece of property, who had rectified the sole complaint of code violation brought against him. Those few whom the shoes fit can put them on. But others, this plaintiff included, cannot make such reference to an unnamed "few" into derogation of all "absentee landlords." Plaintiff on appeal, quotes and relies upon a decision of this court holding that ". . . in determining whether the communication is capable of a defamatory meaning . . . the surrounding circumstances under which the alleged slander or libel was published must be taken into consideration."[10] Here those surrounding circumstances include the fact that we deal with an endeavor by a radio station and television station, as a public service feature,[11] to focus public attention on

[10] *Martin v. Outboard Marine Corp.*, *supra*, footnote 3, at page 463.

[11] *See:* 47 U. S. Code, sec. 315 (a), which states: "Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." *See also:* 47 C. F. R., secs. 73.111 and 73.669

the matter of housing code enforcement and to discuss possible improvements in enforcement and court procedures. Art. I, sec. 3 of the Wisconsin Constitution, providing that the legislature shall make no law "to restrain or abridge the liberty of speech or of the press," clearly seeks to protect the right of such news coverage and such editorial comment as to conditions in a community or issues of public concern.[12] However, in the case before us we have spent no time on the special circumstances surrounding the publication of this claimed defamatory material for the reason that, regardless of such circumstances, what was here communicated was not, as a matter of law, ". . . reasonably capable of conveying a defamatory meaning to the ordinary mind. . . ."[13] With this the case, it cannot, under any circumstances, be the basis of a right to maintain an action for defamation of character.[14] That is true whether the words were, as here, broadcast over a radio station or television station, or were spoken at a public meeting, printed in a newspaper or said around a coffeehouse table. Either limiting review to what was said on the August 24th broadcast, considered "by itself," or under the broader view of considering the portions of the series of broadcasts incorporated in plaintiff's complaint, we hold, as

(1974), requiring radio and TV broadcast stations to keep "program logs." One type of program to be identified in these logs is "public affairs programs." 47 C. F. R., sec. 73.112, note 1 (d), and sec. 73.670, note 1 (d) (1974).

[12] *See: Gertz v. Welch* (1974), 418 U. S. 323, 347, 94 Sup. Ct. 2997, 41 L. Ed. 2d 789, the court holding: "We hold that, so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual."

[13] *Meier v. Meurer, supra,* footnote 5, at page 29. *See also: Waldo v. Journal Co., supra,* footnote 3, at page 210.

[14] *Waldo v. Journal Co., supra,* footnote 3, at page 210.

a matter of law, that the plaintiff has failed to state a cause of action. So holding, we reverse the trial court overruling the demurrer of the defendant-appellant to the complaint of plaintiff-respondent, and remand the case with directions to enter an order sustaining the demurrer without leave to plead over.

*By the Court.*—Order reversed, and cause remanded with directions to sustain the demurrer of defendant-appellant to the complaint of plaintiff-respondent, without right to plead over, pursuant to the opinion.