2024 WI App 9

# COURT OF APPEALS OF WISCONSIN
## PUBLISHED OPINION

Case No.:        2023AP32

Complete Title of Case:

>        MARK D. WAGNER, JR.,
>
>            PLAINTIFF-APPELLANT,
>
>        V.
>
>        ALLEN MEDIA BROADCASTING, D/B/A WKOW-TV CHANNEL 27,
>
>            DEFENDANT-RESPONDENT.

| | |
|---|---|
| Opinion Filed: | January 5, 2024 |
| Submitted on Briefs: | August 18, 2023 |

| | |
|---|---|
| JUDGES: | Blanchard, Graham, and Taylor, JJ. |

| | |
|---|---|
| Appellant ATTORNEYS: | On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *William R. Rettko* of *Rettko Law Offices, S.C.*, Brookfield. |
| Respondent ATTORNEYS: | On behalf of the defendant-respondent, the cause was submitted on the brief of *Cynthia Counts* of *Fisherbroyles, LLP*, Atlanta, Georgia, and *James A. Friedman* of *Godfrey & Kahn, S.C.*, Madison. |

# COURT OF APPEALS DECISION DATED AND FILED

## January 5, 2024

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2023AP32**

**STATE OF WISCONSIN**

Cir. Ct. No. **2022CV1304**

**IN COURT OF APPEALS**

---

MARK D. WAGNER, JR.,

    PLAINTIFF-APPELLANT,

V.

ALLEN MEDIA BROADCASTING, D/B/A WKOW-TV CHANNEL 27,

    DEFENDANT-RESPONDENT.

---

APPEAL from an order of the circuit court for Dane County: FRANK D. REMINGTON, Judge. *Affirmed in part and reversed in part.*

Before Blanchard, Graham, and Taylor, JJ.

¶1 GRAHAM, J. Mark D. Wagner, Jr. appeals a judgment entered by the circuit court that dismissed his claims against Allen Media Broadcasting, d/b/a WKOW-TV Channel 27 ("WKOW"). Wagner argues that the court erred when it granted WKOW's motion for judgment on the pleadings on the grounds that

Wagner's complaint fails to state claims for defamation and negligence. We conclude that, to the extent that the complaint pleads a standalone claim for negligence, the court properly dismissed that claim. Turning to the defamation claim, we conclude that Wagner's complaint states a claim for defamation, and that the court erred by dismissing it. However, nothing in this opinion should be read to foreclose the court from concluding in future proceedings, on a more developed record, that WKOW is entitled to judgment based on the "actual malice" standard set forth in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).

¶2 Accordingly, as discussed in greater detail below, we affirm the circuit court's order in part and reverse it in part.

## BACKGROUND

¶3 This case involves two law enforcement officers, both named Mark Wagner, each of whom shot an unarmed suspect in the line of duty, and news reports that WKOW broadcast and published that conflated the officers' identities. The following summary of factual allegations is taken from the complaint that one of the officers filed against WKOW, as well as documentary evidence of the news reports that were considered by the circuit court.

¶4 The plaintiff in this case is Mark D. Wagner, Jr. and, throughout the opinion, we refer to him as "Plaintiff Wagner" in order to distinguish him from the other officer named Mark Wagner who was also implicated in WKOW's news reports. Plaintiff Wagner was employed as a police officer with the Milwaukee Police Department until his retirement in 2019. While on duty in 2002, Plaintiff Wagner shot and killed an unarmed suspect named Edward Pundsack. That incident was the subject of an inquest that ultimately deemed Plaintiff Wagner's

2

use of deadly force to be justified, and a civil settlement between the City of Milwaukee and the Pundsack family.

¶5    The other officer is Mark P. Wagner, who we refer to as "Agent Wagner" throughout the opinion. Agent Wagner also worked as a detective for the Milwaukee Police Department for a time, and then at some point he was hired by the state department of justice division of criminal investigation (hereinafter, "DCI"). On February 3, 2022, while acting as a DCI agent, Agent Wagner was one of two officers who discharged a weapon in the course of executing an outstanding arrest warrant for an unarmed man named Quadren Wilson.

¶6    Several weeks after the Wilson shooting, WKOW broadcast and published the on-air and online news reports that are the subject of Plaintiff Wagner's complaint. The on-air broadcasts included a 90-second segment, which we refer to as the "6:00 p.m. broadcast," that aired on February 21, 2022, as well as several shorter segments that either "teased" the 6:00 p.m. broadcast or repeated some of the same information later that evening and the following morning. WKOW also published an online article that repeated substantially similar information as the 6:00 p.m. broadcast.

¶7    The impetus of the news reports was to provide background information on one of the law enforcement officers who had been involved in the Wilson shooting. In so doing, the reports conflated information about Agent Wagner and information about Plaintiff Wagner, and attributed both shootings (the Pundsack shooting in 2002 and the Wilson shooting in 2022) to a single officer who was the subject of the reports. The reports identified the subject as "DCI Agent Mark Wagner," and also sometimes as "this officer" and "Wagner," and the broadcast displayed old footage of Plaintiff Wagner as he testified at a 2003

3

inquest hearing about his role in the Pundsack shooting. The broadcast identified the officer in the 2003 footage as "DCI Agent Mark Wagner." It also included footage of an interview with a member of Pundsack's family and an interview with Wilson's attorney. We provide additional information about the news reports as needed in the discussion below.

¶8    On the night the news reports were first broadcast and published, DCI employees notified the director of communications at the state department of justice that the news reports were false. The following morning, the director of communications informed WKOW that there were two separate officers named Mark Wagner and that the news reports had conflated their identities. WKOW issued a correction that day.

¶9    As noted, Plaintiff Wagner filed a complaint against WKOW. The complaint does not identify any specific cause of action by name, but it generally alleges that WKOW's news reports falsely stated that he was "DCI Agent Mark Wagner," and implied that he had used excessive and unlawful force and had a history or pattern of doing so. The complaint alleges that WKOW was "negligent" in making these false statements, and that WKOW "failed to use the required ordinary care in checking on the identity of DCI Agent Mark Wagner before running the story." The complaint also alleges that, upon information and belief, WKOW "ran the false story at least once" after having received notice and "knowing [that the] report was false and … [made] in reckless disregard of the truth." The complaint further alleges that, as a result of WKOW's false news reports, Plaintiff Wagner suffered "humiliation, loss of reputation, and physical endangerment to him and his family," as evidenced by protests that occurred at the scene of the Wilson shooting. The complaint alleges that, during these protests, "protestors … claim[ed]" that the "Mark Wagner who shot Wilson … was a

4

former Milwaukee Police Department Sergeant who killed an individual in a matter settled out of court," and protestors "demanded his termination" and imprisonment. The complaint seeks compensatory and punitive damages.

¶10    In its answer, WKOW admits that it published the news reports. It affirmatively alleges details of the investigation it conducted before it broadcast and published the reports, and the factual basis for its determination that "DCI Agent Mark Wagner" had discharged his firearm during the Wilson incident and had also shot Pundsack in 2002. And it asserts several defenses, including that the complaint fails to state a claim for defamation, that the challenged statements were constitutionally privileged, and that Plaintiff Wagner is a public official and limited purpose public figure required to allege "actual malice," which he fails to allege. Attached to WKOW's answer were various exhibits, including but not limited to a copy of the online article.[1]

¶11    WKOW moved for judgment on the pleadings pursuant to WIS. STAT. § 802.06(3) (2021-22).[2] It argued that the complaint fails to state a claim for defamation because it fails to allege that the news reports contained any

_____

[1] WKOW also attached other documents, including an "on air script" of all of the broadcasts, exhibits documenting the investigation WKOW undertook prior to and after publication of the news reports, the correction it published on February 22, 2022, several news reports about the Wilson shooting that had been published by other news organizations prior to WKOW's news reports, and two news reports about Plaintiff Wagner's shooting of Pundsack in 2002. Additionally, in its subsequent brief in support of its motion for judgment on the pleadings, WKOW asked the court to take judicial notice of numerous media articles published between 2001 and 2022 on topics related to police shootings, including but not limited to articles about the Pundsack shooting and the inquest hearing regarding Plaintiff Wagner's use of force in that incident. As discussed below, the court did not consider any of these documents when it ruled on WKOW's motion for judgment on the pleadings.

[2] All references to the Wisconsin Statutes are to the 2021-22 version.

defamatory statements about Plaintiff Wagner. It also argued that Plaintiff Wagner is a public official or a limited purpose public figure who is therefore required to allege actual malice, and that his complaint does not allege that WKOW published the news reports with actual malice.

¶12 In his response to WKOW's motion for judgment on the pleadings, Plaintiff Wagner argued that the complaint sufficiently alleges that the news reports contained false and defamatory statements. He argued that he is not a public official or a public figure and accordingly, that he is not required to allege actual malice to state a claim for defamation. Finally, he argued that, for purposes of proving presumed or punitive damages, he should be entitled to discovery on the issue of actual malice. Attached to Plaintiff Wagner's response were various exhibits, including but not limited to an audiovisual recording of the 6:00 p.m. broadcast and a printed copy of the online article.[3]

¶13 The circuit court held a hearing on WKOW's motion and then issued a written decision and order dismissing Plaintiff Wagner's complaint. During the hearing, the court sought clarification about whether the complaint alleges a standalone cause of action for negligence in addition to the defamation claim. In response, the attorney for Plaintiff Wagner appears to have taken the position that the complaint does not allege a separate negligence claim, and instead that its allegations about negligence pertain to the degree of fault that a person who is not

---

[3] In his response to WKOW's motion for judgment on the pleadings, Plaintiff Wagner also attached additional documents, including an affidavit detailing his ability to retrieve the online article on February 23, 2022, and correspondence between the department of justice director of communications and a representative of the Dane County Sheriff's Office about the false report. Again, as discussed below, the court did not consider these documents when it ruled on WKOW's motion for judgment on the pleadings.

a public individual must prove when pursuing a defamation claim against a media defendant. *See Denny v. Mertz*, 106 Wis. 2d 636, 654, 657-58, 318 N.W.2d 141 (1982) (discussed at length below).

¶14     In its written decision, the circuit court construed Plaintiff Wagner's complaint to allege separate causes of action for defamation and negligence. In ruling on the motion for judgment on the pleadings, the court limited its review to the complaint and answer, as well as the audiovisual recording of the 6:00 p.m. broadcast and the copy of the online article, which it incorporated into the complaint by reference. *See Soderlund v. Zibolski*, 2016 WI App 6, ¶37, 366 Wis. 2d 579, 874 N.W.2d 561 (2015) (addressing the incorporation-by-reference doctrine, as discussed below). The court declined to consider the remaining extrinsic matters because it determined that they were not amenable to incorporation by reference, and that it would be inappropriate to take judicial notice of other documents in ruling on the motion.

¶15     Based on the complaint, the answer, and the incorporated news reports, the circuit court concluded that the complaint fails to state a claim for defamation. The court began its analysis by determining that Plaintiff Wagner is not a public official or limited purpose public figure required to allege actual malice. Even so, the court determined that the complaint fails to state a claim for defamation because, the court said, no person would reasonably understand the news reports to be about Plaintiff Wagner. In any event, the court determined, the false news reports "could not reasonably be interpreted as harming [Plaintiff Wagner's] reputation because [they] did nothing more than describe the activity of law enforcement." The court also dismissed Plaintiff Wagner's negligence claim because it concluded that the complaint fails to state a claim for negligence. Plaintiff Wagner appeals.

7

**DISCUSSION**

¶16 On appeal, we review the circuit court's order granting WKOW's motion for judgment on the pleadings. This presents a question of law we review de novo. *Freedom From Religion Found., Inc. v. Thompson*, 164 Wis. 2d 736, 741, 476 N.W.2d 318 (Ct. App. 1991).

¶17 "A judgment on the pleadings is essentially a summary judgment decision without affidavits and other supporting documents." *Southport Commons, LLC v. DOT*, 2021 WI 52, ¶18, 397 Wis. 2d 362, 960 N.W.2d 17. We first consider whether the complaint states a claim. *McNally v. Capital Cartage, Inc.*, 2018 WI 46, ¶23, 381 Wis. 2d 349, 912 N.W.2d 35. If so, we examine the responsive pleading to ascertain the existence of disputed issues of material fact. *Id.* Judgment on the pleadings is proper only if, based on these sources, no disputed issues of material fact remain to be resolved by a jury and one party is entitled to judgment as a matter of law. *Tri City Nat. Bank v. Federal Ins. Co.*, 2004 WI App 12, ¶34, 268 Wis. 2d 785, 674 N.W.2d 617 (2003).

¶18 Judgment on the pleadings is ordinarily confined to the complaint and answer. *Schuster v. Altenberg*, 144 Wis. 2d 223, 228, 424 N.W.2d 159 (1988); *see also* WIS. STAT. § 802.06(2)(b), (3). An exception to this rule is the doctrine of incorporation by reference. *Soderlund*, 366 Wis. 2d 579, ¶37. Under this exception, "a court may consider a document attached to a motion … for judgment on the pleadings without converting the motion into one for summary judgment[] if the document was referred to in the plaintiff's complaint, is central to his or her claim, and its authenticity has not been disputed." *Id.* Otherwise, if "matters outside the pleadings are presented and not excluded by the court, the motion … shall," upon proper notice to the parties, "be treated as one for summary

judgment." *See* § 802.06(2)(b). A circuit court's decision to admit or exclude matters outside the pleadings is discretionary. ***Alliance Laundry Sys. LLC v. Stroh Die Casting Co., Inc.***, 2008 WI App 180, ¶14, 315 Wis. 2d 143, 763 N.W.2d 167.

¶19 As noted above, in reviewing WKOW's motion for judgment on the pleadings, the circuit court declined to convert the motion into one for summary judgment, and it excluded from its consideration most of the exhibits that were attached to the parties' filings as well as the links to other media articles that WKOW supplied in its briefing. The court did, however, apply the incorporation-by-reference doctrine to the audiovisual recording of the 6:00 p.m. broadcast and a copy of the online article, both of which were referenced in Plaintiff Wagner's complaint. It appears that the court properly considered these documents under the incorporation-by-reference doctrine. *See **Soderlund***, 366 Wis. 2d 579, ¶37. Neither party challenges the court's reliance on the recording of the 6:00 p.m. broadcast and a copy of the online article, nor do they challenge the court's exclusion of the other extrinsic matters presented by the parties as erroneous exercises of discretion. We therefore confine our review to the complaint and the answer, as well as the recording of the 6:00 p.m. broadcast and printed copy of the online article, which we refer to collectively as the incorporated news reports.

¶20 On appeal, Plaintiff Wagner contends that the circuit court erroneously granted WKOW's motion for judgment on the pleadings on the grounds that the complaint fails to state claims for defamation and for common law negligence. We address the causes of action in turn, beginning with defamation.

## I. The Defamation Claim

¶21     As a starting point for all defamation claims, the plaintiff must allege a false statement that was communicated to a third person that is unprivileged and capable of defamatory meaning. ***Donohoo v. Action Wis., Inc.***, 2008 WI 56, ¶37, 309 Wis. 2d 704, 750 N.W.2d 739.  Apart from these requirements, there may be additional constitutional requirements depending on the status of the plaintiff and defendant.  As relevant here, the United States Supreme Court has determined that the First Amendment, as applied to the states under the Fourteenth Amendment, requires fault on WKOW's part in order to establish its liability for defamation.[4] As we discuss at greater length below, the degree of fault—actual malice or negligence—depends on the plaintiff's status, and whether the plaintiff is a public or private individual.  *See **Sidoff v. Merry***, 2023 WI App 49, ¶14, 409 Wis. 2d 186, 996 N.W.2d 88; ***Torgerson v. Journal/Sentinel, Inc.***, 210 Wis. 2d 524, 535 & n.10, 563 N.W.2d 472 (1997).

¶22     WKOW admits that the news reports contain false statements and that it communicated the news reports to third persons.  However, it contends that the complaint fails to state a claim for defamation because it fails to allege any

---

[4] *See **New York Times Co. v. Sullivan***, 376 U.S. 254, 279-80 (1964) (public officials must prove actual malice by media defendant); ***Gertz v. Robert Welch, Inc.***, 418 U.S. 323, 347 (1974) (requiring private individuals to prove fault by media defendants but leaving it to state courts to determine the appropriate degree of fault); *see also **Denny v. Mertz***, 106 Wis. 2d 636, 654, 657-58, 318 N.W.2d 141 (1982) (adopting negligence as the degree of fault required in defamation actions brought by private individuals against media defendants in Wisconsin).

Several more recent cases have questioned the distinction between media and non-media defendants, at least as it pertains to defamation claims filed by public individuals. *See **Bay View Packing Co. v. Taff***, 198 Wis. 2d 653, 674 n.5, 543 N.W.2d 522 (Ct. App. 1995); ***Sidoff v. Merry***, 2023 WI App 49, ¶¶30-35, 409 Wis. 2d 186, 996 N.W.2d 88.  However, we need not address this potential issue here as WKOW is undisputedly a media defendant.

false statement that is capable of a defamatory meaning. Additionally, WKOW advances alternative grounds for affirming the dismissal of the complaint that relate to the degree of fault that Plaintiff Wagner must plead and prove to establish WKOW's liability. We address these arguments in turn.

## A. Defamatory Meaning

¶23 A person claiming defamation must establish that the statement complained of was not only false, but that it was also defamatory. *See Freer v. M&I Marshall & Ilsley Corp.*, 2004 WI App 201, ¶8, 276 Wis. 2d 721, 688 N.W.2d 756. A statement is defamatory if it tends to harm a person's reputation so as to "lower [the person] in the estimation of the community"; "deter third persons from associating or dealing" with the person; or "excite adverse, derogatory or unpleasant feelings or opinions against" the person. *Starobin v. Northridge Lakes Dev. Co.*, 94 Wis. 2d 1, 10-11, 287 N.W.2d 747 (1980). The defamatory meaning communicated by a statement need not be "a direct affirmation," and may instead be "an implication." *Mach v. Allison*, 2003 WI App 11, ¶12, 259 Wis. 2d 686, 656 N.W.2d 766 (2002).

¶24 On a motion to dismiss (or, as here, a motion for judgment on the pleadings), the court plays a limited role in assessing the allegedly defamatory statement identified in the complaint. *Starobin*, 94 Wis. 2d at 10. The court's role is limited to determining whether, as a matter of law, the defendant's statement is "capable of a defamatory meaning." *Id.* A statement is capable of a defamatory meaning if a defamatory implication is "fairly and reasonably conveyed" by the words and images used. *Mach*, 259 Wis. 2d 686, ¶31. If a statement is capable of a defamatory meaning, then the determination of whether such a meaning was in fact conveyed is a factual issue to be resolved by the jury. *See id.*; *see also*

*Starobin*, 94 Wis. 2d at 10; *Martin v. Outboard Marine Corp.*, 15 Wis. 2d 452, 461-62, 113 N.W.2d 135 (1962) (explaining that the court's role is to assess all possible meanings, and if the court determines that the statement is subject to multiple meanings, one defamatory and the others benign, a jury question is presented). The court should grant a motion for judgment on the pleadings only if the defendant's statement cannot reasonably be understood as defamatory. *Starobin*, 94 Wis. 2d at 10.

¶25 In determining whether a statement is capable of a defamatory meaning, a court should construe the words "in the plain and popular sense in which they would naturally be understood," and should consider the "context and circumstances" in which the statement was made. *Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶19, 351 Wis. 2d 479, 840 N.W.2d 255 (citation omitted). In the context of a television broadcast, the court should "consider the broadcast as a whole, 'not in detached fragments,'" including "both the audio and video portions[,]" as well as "their relation to" and "juxtaposition[s]" from "each other." *Mach*, 259 Wis. 2d 686, ¶31 (citation omitted).

¶26 Here, the complaint alleges that the news reports misidentified Plaintiff Wagner as "DCI Agent Mark Wagner," who was the subject of the news reports. Plaintiff Wagner contends that this misidentification was defamatory because the entirety of the news reports—including the facts that they conveyed about the Wilson and Pundsack shootings (which were accurate in isolation), the comments from Wilson's attorney, the content of the voice overs, and the anchors' commentary—implied that the subject of the reports had used excessive and unlawful force in two different shootings and therefore had a pattern of doing so.

¶27     WKOW responds that the news reports are not capable of a defamatory meaning for two distinct reasons.   First, WKOW argues that no reasonable person would understand that it was Plaintiff Wagner, rather than Agent Wagner, who was the subject of the reports; therefore, it contends, the reports were not capable of defaming Plaintiff Wagner.[5]   Second, WKOW argues that the news reports "did nothing more than describe the activities of law enforcement" and are not reasonably capable of implying that the subject of the reports had used excessive or unlawful force or had a history or pattern of doing so.   We begin our analysis with more detailed information about the incorporated news reports and then address and reject WKOW's alternative arguments about defamatory meaning.

### 1.  The Incorporated News Reports

¶28     The 6:00 p.m. broadcast consisted of a 90-second "news package," which was bookended by commentary from two news anchors.  As the anchors introduced the news package, a banner on the screen behind them read "SPECIAL AGENTS ON LEAVE."  One anchor stated, "One of the law enforcement officers involved in the Quadren Wilson incident has killed a suspect in the past."  The

---

[5] WKOW did not advance this specific argument during the circuit court proceedings. Indeed, the brief it filed in support of its motion for judgment on the pleadings acknowledged that its news reports "misidentif[ied]" Plaintiff Wagner "as being the DCI Agent, Mark Wagner." WKOW squarely advances this argument for the first time in its appellate briefing, apparently in support of the aspects of the circuit court decision that employed this reasoning.  We likewise address this issue here because it was a basis the circuit court gave for granting the motion for judgment on the pleadings.  *See* ***Olmsted v. Circuit Ct. for Dane Cnty.***, 2000 WI App 261, ¶12, 240 Wis. 2d 197, 622 N.W.2d 29 (the court of appeals can address issues not raised in the circuit court).

other anchor stated, "Tony Galli reports on the two controversial chapters of this officer's career."

¶29 The broadcast cut to the news package. It commenced with voice-over audio narrated by reporter Tony Galli, which was juxtaposed with video footage related to the Quadren Wilson and Edward Pundsack shootings. The news package then cycled between Galli's voice-over narration, a clip of a 2002 interview with a member of Pundsack's family, and Galli's interview with Wilson's attorney. The video footage that was juxtaposed with Galli's voice-over narration included footage of Wilson being wheeled away on a stretcher with dozens of law enforcement vehicles parked alongside the road; Plaintiff Wagner testifying at the 2003 inquest hearing regarding the Pundsack shooting; Pundsack's mug shot side by side with an image of Wilson; images of law enforcement vehicles executing a traffic stop; and a graphic that included text detailing the settlement between the Pundsack family and the City of Milwaukee. The news package juxtaposed the audio and video clips as follows:

> [Galli's narration over video of the scene of the Wilson shooting:] "Quadren Wilson was wheeled away after being shot and arrested, with DCI Agent Mark Wagner having opened fire."
>
> [Galli's narration over footage of Plaintiff Wagner rising to testify at 2003 inquest hearing and Pundsack mug shot:] "Wagner was also at the crime scene in 2002, when as a Milwaukee officer he shot and killed 28-year[-]old suspect Edward Pundsack."
>
> [Prerecorded clip of Pundsack's family member:] "I do not believe for one second everything that's been said."
>
> [Prerecorded clip of Plaintiff Wagner testifying at 2003 inquest hearing:] "I fired four rounds."
>
> [Galli's narration over video of a traffic stop:] "Wagner maintained Pundsack was driving recklessly to try to get away and another officer was in his path."

[Prerecorded clip of Plaintiff Wagner testifying at 2003 inquest hearing:] "I knew he was going to be killed."

[Prerecorded clip of Pundsack's family member:] "It disgusts me to know all that it would take was for someone to jump out of the way for him to be alive."

[Galli's narration over graphic about the City's settlement with Pundsack's family:] "An inquest found Wagner's shooting justified. A lawsuit over the shooting was dismissed after the City of Milwaukee agreed to pay $50,000."

[Video and audio clip of Wilson's attorney:] "It is extremely horrifying this officer did this."

[Galli's narration over image of Wilson side by side with Pundsack's mug shot:] "As with Quadren Wilson, Pundsack had no gun."

[Video and audio clip of Galli interviewing Wilson's attorney:]

> [Galli:] "Does this give you pause that the officer involved currently, 2022, not only was involved in a past shooting but it involved an unarmed person again?"

> [Wilson's Attorney:] "Yes, it is extremely concerning."

[Galli's narration over video of the scene of Wilson shooting:] "Two decades later, scrutiny again falls on this officer's actions. Tony Galli, 27 News."

¶30 The broadcast then cut back to the news desk, and the segment closed with one of the anchors reporting: "Dane County Sheriff's officials will only say the DCI agents fired their weapons February 3rd, but they have no comment on whether they wounded Wilson."

¶31 The online news article repeated substantially the same information as the broadcast, but it included more detail on the two shootings and Plaintiff

Wagner's statements during the Pundsack inquest hearing. Specifically, the article

provided in full:

> A State Justice Department agent who Dane County Sheriff's officials have identified as firing his gun during the Quadren Wilson shooting incident fatally shot a suspect two decades ago.
>
> Division of Criminal Investigation (DCI) Agent Mark Wagner has been identified as one of two DCI agents to have opened fire during Wilson's Feb. 3 drug arrest and shooting in Madison, as more than twenty law enforcement officers deployed to capture Wilson during a traffic stop. Sheriff's officials say Wilson was unarmed. Family members say Wilson was shot five times in the back and provided 27 News with medical records on his injuries.
>
> Court records show Wagner shot and killed suspect Edward Pundsack, 28, in Milwaukee Dec. 23, 2002, when Wagner was a sergeant with the Milwaukee Police Department.
>
> During an inquest into the shooting, Wagner maintained Pundsack's reckless driving during an attempted get away left him with no choice but to resort to deadly force.
>
> "The driver of the vehicle put the shifter down into reverse, the car accelerated back at a high rate of speed, it jolted," Wagner testified during the 2003 inquest. "I knew the only place it could have travelled was the area between the squad and the parked car where Officer Frank was," Wagner said. "I knew he was going to be killed. I fired four rounds at that time," Wagner testified.
>
> "It disgusts me to know that all that it would take was for someone to jump out of the way for him to be alive," one of Pundsack's family members said following the shooting.
>
> Pundsack's father, wife, and juvenile daughter filed a lawsuit against the city of Milwaukee over his shooting death. Records show the lawsuit was dismissed by a federal court judge April 13, 2007, after city officials agreed to pay a $50,000 settlement.
>
> Wilson's attorney, Steve Eisenberg says Wagner's history is concerning, even though his use of deadly force was deemed justified.

"I don't [sic] what happened twenty years ago happened today, things would be different because times were different twenty years ago," Eisenberg says.

Eisenberg says Wagner's past experience should have informed his approach to Wilson's arrest and led to more caution.

"Mr. Wagner knew what could happen when he approached a vehicle because he already killed somebody before and that is frightening," Eisenberg says. 27 News has been unable to reach Wagner to request his comment.

## 2. Ascertainment

¶32    We begin with WKOW's argument that the news reports were not capable of defaming Plaintiff Wagner because they were about Agent Wagner, and no reasonable person would have understood Plaintiff Wagner to be the subject of the reports. The premise of this argument is that, even though WKOW itself conflated the two officers' identities and attributed the two shootings to the single officer who was the subject of the reports, WKOW's viewers would have reasonably understood that the subject of the reports was Agent Wagner and not Plaintiff Wagner and, therefore, Plaintiff Wagner's reputation could not have been injured by its reporting. This argument has no merit.

¶33    Our case law provides that, for a statement to be defamatory, it must "refer to some ascertained or ascertainable person, and that person must be the plaintiff." *Arnold v. Ingram*, 151 Wis. 438, 452, 138 N.W. 111 (1912) (citation omitted); *see also* *Luthey v. Kronschnabl*, 239 Wis. 375, 379, 1 N.W.2d 799 (1942). "If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory." *Arnold*, 151 Wis. at 452. This concept is sometimes referred to as "ascertainment." *See* *Giwosky v. Journal Co.*, 71 Wis. 2d 1, 10 & n.9, 237 N.W.2d 36 (1976).

¶34 The concept of ascertainment often comes into play when a publication refers collectively to a group of unidentified individuals.[6] Here, however, WKOW invokes the other aspect of ascertainment—that the defamatory statement must refer to the plaintiff—to argue that Plaintiff Wagner cannot "identify a defamatory statement" in the news reports *that refers to him*.[7] According to WKOW, "every reference to 'Mark Wagner'" in the news reports either "explicitly or implicitly refers to DCI [Agent] Wagner." WKOW acknowledges that the reports contained old footage of Plaintiff Wagner testifying about the Pundsack shooting at the 2003 inquest hearing. However, it contends that no person would reasonably believe the news reports to be about Plaintiff Wagner because the broadcasts identified the footage as depicting "DCI Agent Mark Wagner," and because WKOW's reporting contained "distinguishing facts" about Agent Wagner that would have allowed its viewers to exclude Plaintiff Wagner as the subject of the reports.

---

[6] *See Giwosky v. Journal Co.*, 71 Wis. 2d 1, 10 & n.9, 237 N.W.2d 36 (1976) (although remarks critical of absentee attorney landlords may have been defamatory to that group generally, the ascertainment requirement was not met because the defamatory statements did not refer specifically to the plaintiff or identify him as a member of the group); *see also Ogren v. Employers Reinsurance Corp.*, 119 Wis. 2d 379, 382, 383, 350 N.W.2d 725 (Ct. App. 1984) (citing RESTATEMENT (SECOND) OF TORTS § 564A (1977)) (explaining that when a publication refers to all members of a small group, the defamed persons are ascertainable and concluding that when a statement allegedly defamed an identified individual's "family," that individual's mother and sister were reasonably ascertainable persons but that his aunt and uncles were not).

[7] In support of this proposition, WKOW relies in part on an authored but unpublished opinion that cannot be cited in any Wisconsin court except under limited circumstances not present here. *See* WIS. STAT. RULE 809.23(3)(a) We remind counsel that this citation violates the rules of appellate procedure; parties are not permitted to cite any unpublished opinions that were issued before July 1, 2009. *See* RULE 809.23(3)(b).

¶35    We reject WKOW's arguments. The news reports mistakenly conflated the identities of Plaintiff Wagner and Agent Wagner, and then attributed their backgrounds and respective shootings to a single subject, who the reports referred to as "DCI Agent Mark Wagner." Although Plaintiff Wagner had never in fact been an agent with DCI, it is not reasonable to assume that WKOW viewers would tune in to its broadcasts armed with knowledge about the details of Plaintiff Wagner's employment history, such that they could exclude Plaintiff Wagner as the subject of the reports on that basis. WKOW attributed the Pundsack shooting and other aspects of Plaintiff Wagner's background to the officer it referred to as "DCI Agent Mark Wagner." WKOW used the inquest footage of Plaintiff Wagner to depict the officer it referred to as "DCI Agent Mark Wagner." And contrary to WKOW's arguments, the fact that WKOW identified Plaintiff Wagner's image as "DCI Agent Mark Wagner" would not necessarily have undermined the inference that he was "DCI Agent Mark Wagner"—most likely, it would have amplified that inference. Viewers might therefore reasonably have concluded that the reports' references to "DCI Agent Mark Wagner" referred to Plaintiff Wagner.

¶36    WKOW argues that the presence of distinguishing facts in the reports would have allowed viewers to exclude Plaintiff Wagner as the subject of the reports, but this argument depends on the unreasonable premise that WKOW's viewers would have, for unknown reasons, been aware of the key facts that its reporters failed to uncover—that there were two different officers named Mark Wagner, and that the officer who had shot Pundsack and was depicted in the inquest footage was a different officer than the one who was currently under investigation for the Wilson shooting. Given WKOW's news reports, it is certainly possible that some WKOW viewers incorrectly attributed the Pundsack shooting to Agent Wagner. But, as stated, it is equally possible that some viewers

might have understood Plaintiff Wagner to be the subject of the reports, and then incorrectly attributed the Wilson shooting to him. This would have been especially likely for the smaller subset of viewers who happened to be familiar with Plaintiff Wagner and his involvement in the Pundsack shooting that occurred 20 years earlier. WKOW makes other arguments on topics such as whether Plaintiff Wagner's image in the inquest footage "was even recognizable to any WKOW viewer," but these are not matters that the court can decide as a matter of law, and are instead factual issues for a jury. *See Starobin*, 94 Wis. 2d at 10 (whether the defamatory meaning was in fact conveyed is a question for the jury).

### 3. Implication of Excessive or Unlawful Force

¶37 We next address WKOW's argument that the news reports merely "describe the activities of law enforcement" and are not reasonably capable of implying anything defamatory about the subject of the reports.

¶38 WKOW does not appear to dispute that a statement falsely implying that a law enforcement officer has used, or has a pattern of using, excessive or unlawful force would tend to injure their reputation in the community. Indeed, such an argument would likely be unavailing.[8]

¶39 Instead, WKOW argues that nothing in the reports implied that the subject of the reports had a history or pattern of using excessive or unlawful force.

---

[8] *See Fields Found., Ltd. v. Christensen*, 103 Wis. 2d 465, 483, 309 N.W.2d 125 (Ct. App. 1981) (communications which allege that an individual or a business has engaged in "dishonorable, unethical or unprofessional conduct in a trade, business or profession are capable of a defamatory meaning"); *Converters Equip. Corp. v. Condes Corp.*, 80 Wis. 2d 257, 263, 258 N.W.2d 712 (1977) ("A statement is … defamatory if, in its natural and ordinary sense, it imputes to the person charged commission of a criminal act.").

It asserts that the news reports merely stated that the officer it identified as "DCI Agent Mark Wagner" had been involved in two shootings, and that fact, although false, is not inherently defamatory. According to WKOW, it truthfully reported the facts of both the Wilson shooting and the Pundsack shooting, and nothing in its reporting implied that "DCI Agent Mark Wagner" used excessive or unlawful force during either incident. Regarding the fatal Pundsack shooting, WKOW rejects as unreasonable any implication that the officer used excessive or unlawful force, noting that WKOW "affirmatively and unequivocally reported that the [Pundsack] shooting was deemed justified." And, with respect to the Wilson shooting, WKOW asserts that it merely reported that "DCI Agent Mark Wagner" was one of many law enforcement officers present for Wilson's arrest; that he was one of two officers who had discharged their weapons; and that it was unknown whether he had wounded Wilson. WKOW points to its statement that the officer had not been criminally charged at the time of the broadcast. And, although the reports referenced an investigation by the sheriff's office, WKOW asserts that "viewers would have known that [the officer] was simply being investigated as a matter of routine procedure" and would not have drawn the inference that he had committed any wrongdoing. Because its news reports did not expressly accuse the officer of using excessive or unlawful force during either incident, WKOW rejects any implication that the subject had a history or pattern of doing so. Finally, although it acknowledges that some of the comments by Wilson's attorney may have implied that "DCI Agent Mark Wagner" had used, or had a history or pattern of using, excessive or unlawful force, WKOW argues that it is not responsible for those comments, and that the comments are non-actionable opinions.

¶40 As an initial matter, we assume for purposes of this opinion that the comments from Wilson's attorney are not themselves actionable because they are

21

"pure expressions of opinion."[9] Even setting the attorney's comments aside, we reject WKOW's arguments that the news reports are incapable of defaming Plaintiff Wagner.

¶41 First, WKOW's arguments are premised on the idea that, absent an express allegation of excessive or unlawful force, there is nothing inherently defamatory about falsely accusing a law enforcement officer of participating in an officer-involved shooting of an unarmed person. We reject this premise as out of touch with contemporary societal views for reasons obvious to anyone who pays attention to current events. In this era, officer-involved shootings of unarmed persons are a charged topic regardless of the specific facts of a shooting and whether a shooting is or is not determined to be legally justified. A false

---

[9] Although not strictly necessary to our decision, we provide the following summary on the law governing defamatory opinions. Generally speaking, defamation claims must be based on statements of fact rather than expressions of opinion. *See Laughland v. Beckett*, 2015 WI App 70, ¶27, 365 Wis. 2d 148, 870 N.W.2d 466. However, if a speaker departs from expressing "pure opinion" and communicates a "mixed opinion," the speaker might be liable for defamation. *Id.*

A "pure expression of opinion" occurs when a speaker states the facts upon which the speaker's opinion is based, and then states an opinion that is based on those facts. *See* RESTATEMENT (SECOND) OF TORTS § 566, 170-72 (1977). In such cases, the factual statements are separated from the opinion, and, although the factual statements may be actionable, the opinion is not itself actionable, no matter how defamatory. A "pure expression of opinion" can also occur without the speaker expressly asserting the facts upon which the speaker's opinion is based. *See id.* This occurs if the parties to the communication know or assume the facts underlying the speaker's opinion, the opinion is clearly based on those known or assumed facts, and the opinion does not imply the existence of other unknown and undisclosed facts. *See id.* (further explaining that "[t]he assumption of facts may come about because someone else has stated them or because they were assumed by both parties as a result of their notoriety or otherwise").

By contrast, "mixed expressions of opinion" are phrased in the form of an opinion but "imply the assertion of undisclosed facts" that justify the opinion, and may be actionable. *Id.* (citation omitted); *see also Terry v. Journal Broad. Corp.*, 2013 WI App 130, ¶14, 351 Wis. 2d 479, 840 N.W.2d 255.

accusation of firing upon an unarmed person could tend to "excite adverse, derogatory or unpleasant feelings" against the officer by at least some members of the community, *Starobin*, 94 Wis. 2d at 10, and could deter at least some "third persons from associating" with the officer, *Ladd v. Uecker*, 2010 WI App 28, ¶8, 323 Wis. 2d 798, 780 N.W.2d 216.

¶42 Second, WKOW's news reports were capable of implying that the officer who discharged his gun in the Wilson incident may have used excessive and unlawful force in that incident, even if the news reports did not expressly state as much. Among other things, WKOW's online article reported that Wilson, who was unarmed, was shot five times in the back. The broadcast stated that the officer was under investigation for having opened fire, and the news anchors referred to the shooting as a "controversial chapter[] of this officer's career." Although WKOW's statements about the Wilson shooting may have been factually accurate as to Agent Wagner, they were inaccurate and potentially defamatory as to Plaintiff Wagner, who, as we have concluded, viewers could reasonably have understood to be the subject of the reports.

¶43 Finally, the news reports attributed not just one but two shootings of unarmed suspects to a single officer, specifically describing the shootings as "two controversial chapters" in his career and implying that this officer had a history and pattern of using excessive or unlawful force. Indeed, the assertion that this officer had "two controversial chapters" in his career appears to have been the reason that the story was newsworthy in the first instance. The comments from Wilson's attorney, which we have assumed cannot be the basis of a defamation claim, nevertheless illustrate the defamatory implications that viewers could reasonably draw from the false news reports.

¶44     In summary, we reject WKOW's arguments that the news reports were not capable of defaming Plaintiff Wagner.

## B. Degree of Fault

¶45     WKOW advances several alternative grounds for affirming the circuit court's dismissal, all of which relate to the degree of fault Plaintiff Wagner must allege to state a claim for defamation.

¶46     As mentioned, when a public individual pursues a defamation claim against a media defendant, the First Amendment is implicated and requires the plaintiff to prove actual malice to establish that the defendant is liable for a defamatory falsehood.[10]     *Sidoff*, 409 Wis. 2d 186, ¶14 (citing *New York Times Co.*, 376 U.S. at 279-80); *Donohoo*, 309 Wis. 2d 704, ¶38; *Torgerson*, 210 Wis. 2d at 535 & n.10.   The actual malice standard was established by the United States Supreme Court in *New York Times*, and it is "a minimal accommodation of the reputational interests of public [individuals] and the community's interest in unfettered public debate."[11]    *Torgerson*, 210 Wis. 2d at 535-36.   "Proof of actual malice requires a showing that the defamatory falsehood was published with knowledge of its falsity or with reckless disregard for its truth."  *Id.* at 536 (citing *New York Times Co.*, 376 U.S. at 279-80).

---

[10] We use the term "public individual" as an umbrella term that encompasses both "public officials" and "public figures."  Some cases use "public official" as the umbrella term, but this usage can be confusing and we avoid it.

[11] Our cases sometimes describe this requirement as a "constitutional privilege" on the publication of defamatory falsehoods about public officials and figures.  *See Torgerson v. Journal/Sentinel, Inc.*, 210 Wis. 2d 524, 535, 563 N.W.2d 472 (1997).  "The privilege … is conditional, and the condition is the absence of actual malice."  *Id.*

¶47    By contrast, in order to establish liability and to recover actual damages in a defamation action brought by a private individual against a media defendant, the plaintiff need only prove that the defendant negligently published the defamatory falsehood. *See Denny*, 106 Wis. 2d at 654, 657-58. Proof of actual malice is not required unless the private individual also seeks to recover presumed or punitive damages. *Id.* at 639.

¶48    WKOW contends that Plaintiff Wagner's complaint fails to allege the required degree of fault to establish its liability. It asserts that Plaintiff Wagner is a public individual and fails to allege actual malice. Alternatively, WKOW argues that even if Plaintiff Wagner is a private individual, he fails to allege facts that would allow a reasonable jury to find that it was negligent. We first address whether Plaintiff Wagner is a public individual required to allege actual malice, and then address WKOW's alternative arguments about negligence.

### 1.  Actual Malice

¶49    The actual malice standard applies to two broad categories of public individuals:  public officials and public figures. *Lewis v. Coursolle Broad. of Wis., Inc.*, 127 Wis. 2d 105, 114, 377 N.W.2d 166 (1985). We address these two categories in turn.

### a.  Public Official

¶50    The circuit court determined that Plaintiff Wagner was not a public official because he retired from his public employment as a police officer in 2019, several years before the news stories aired. As we discuss in greater detail below, this determination is consistent with a legal conclusion that our supreme court made in *Lewis*, 127 Wis. 2d 105, and that we repeated in *Biskupic v. Cicero*, 2008

25

WI App 117, 313 Wis. 2d 225, 756 N.W.2d 649. Both cases unequivocally stated that persons who qualify as public officials during their terms in office are no longer considered public officials for First Amendment purposes after they retire. *Id.*, ¶18-19; *Lewis*, 127 Wis. 2d at 115. Although we question whether these cases are consistent with the United States Supreme Court precedent in *Rosenblatt v. Baer*, 383 U.S. 75 (1966), we are bound to follow them pursuant to *Cook v. Cook*, 208 Wis. 2d 166, 189, 560 N.W.2d 246 (1997), and *Zarder v. Humana Ins. Co.*, 2010 WI 35, ¶¶53-58, 324 Wis. 2d 325, 782 N.W.2d 682.

¶51 According to Wisconsin case law, "the 'public official' designation 'applies at the very least to those … governmental employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs.'" *Pronger v. O'Dell*, 127 Wis. 2d 292, 295, 379 N.W.2d 330 (Ct. App. 1985) (quoting *Rosenblatt*, 383 U.S. at 85). This definition encompasses elected officials as well as certain unelected officials. *Miller v. Minority Broth. of Fire Prot.*, 158 Wis. 2d 589, 599 & n.12, 463 N.W.2d 690 (Ct. App. 1990). To be considered a public official, "[t]he employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutin[y] and discussion occasioned by the particular charges in controversy." *Rosenblatt*, 383 U.S. at 87 n.13.

¶52 Here, the complaint alleges that Plaintiff Wagner was an "officer" and then a "sergeant" employed by the Milwaukee Police Department until his retirement in 2019. According to the incorporated news reports, Plaintiff Wagner was an on-duty sergeant in 2002, at the time of the Pundsack shooting.

¶53 In *Pronger*, 127 Wis. 2d at 295, we concluded that a county chief of police was a public official. *See also Miller*, 158 Wis. 2d at 598-603 (concluding

26

that the Milwaukee fire captain was a public official). Although no Wisconsin case has directly addressed whether a police sergeant qualifies as a public official, we observed in *Pronger* that virtually every jurisdiction to address the status of law enforcement officers has concluded that even rank-and-file police officers constitute "public officials."[12] Especially persuasive is the following excerpt from *Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981):

> The cop on the beat is the member of the department who is most visible to the public. [The officer] possesses both the authority and the ability to exercise force. Misuse of [the officer's] authority can result in significant deprivation of constitutional rights and personal freedoms, not to mention bodily injury and financial loss. The strong public interest in ensuring open discussion and criticism of [the officer's] qualifications and job performance warrant the conclusion that [the officer] is a public official.

---

[12] *See* *Pronger v. O'Dell*, 127 Wis. 2d 292, 295, 379 N.W.2d 330 (Ct. App. 1985) (citing *Cibenko v. Worth Publishers, Inc.*, 510 F. Supp. 761, 765 (D.N.J. 1981) (transit police officer)); *Rosales v. City of Eloy*, 593 P.2d 688, 689 (Ariz. Ct. App. 1979) (police officer); *Angelo v. Brenner*, 406 N.E.2d 38, 40 (Ill. App. Ct. 1980) (city police officer); *Coursey v. Greater Niles Twp. Publ'g Corp.*, 239 N.E.2d 837, 840-41 (Ill. 1968) (patrol officer); *Coughlin v. Westinghouse Broad. & Cable, Inc.*, 603 F. Supp. 377, 385 (E.D. Pa. 1985) ("Courts have consistently treated police officers as public officials within the meaning of *New York Times*."); *Gomes v. Fried*, 186 Cal. Rptr. 605, 610 (Ct. App. 1982) ("Courts have uniformly held that a … low-level police officer is a 'public official' for the purpose of the *New York Times* privilege."); *Smith v. Danielczyk*, 928 A.2d 795, 805 (Md. Ct. App. 2007) ("[I]t appears to be well-settled … that police officers, from patrol officers to chiefs, are regarded for *New York Times* purposes as public officials."); *Rotkiewicz v. Sadowsky*, 730 N.E.2d 282, 288-89 (Mass. 2000) (finding plaintiff police officer to be a public official "in line with the vast majority of other jurisdictions"); *Starr v. Beckley Newspapers Corp.*, 201 S.E.2d 911, 913 (W. Va. 1974) ("courts throughout the land … declare police officers to be public officials as defined in the *New York Times* case"); *see also* *Moriarty v. Lippe*, 294 A.2d 326, 330-31 (Conn. 1972) (applying designation to plaintiff patrol officer); *Jackson v. Filliben*, 281 A.2d 604, 605 (Del. 1971) (applying the designation to sergeant of the city police force); *Suchomel v. Suburban Life Newspapers, Inc.*, 240 N.E.2d 1, 4 (Ill. 1968) (sergeant of countryside police was public official); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) ("Street level police [officers], as well as high ranking officers, qualify as public officials[.]").

27

*Id.* at 591. Based on ***Pronger*** and these other persuasive authorities, we conclude that Plaintiff Wagner was a public official while he was employed as a sergeant with the Milwaukee Police Department.

¶54 However, as noted, the complaint alleges that he retired from the department in 2019, and that the defamatory news reports were published several years later in 2022. WKOW's answer raises no material issue of fact on either point.

¶55 WKOW argues that, despite his retirement, Plaintiff Wagner should still be considered a public official for purposes of the allegedly defamatory news reports, which concerned his official conduct as a law enforcement officer. This argument—that former public officials remain public officials for purposes of defamatory statements concerning their conduct in office—is consistent with United States Supreme Court precedent. In ***Rosenblatt***, 383 U.S. 75, the Court addressed the status of a plaintiff who was the former supervisor of a county recreation area. After concluding that the former supervisor might qualify as a public official despite his retirement, the Court remanded for additional factual development. In so doing, the Court stated:

> It is not seriously contended, and could not be, that the fact [that the plaintiff] no longer supervised the [recreation area] when the column appeared has decisional significance here. To be sure, there may be cases where a person is so far removed from a former position of authority that comment on the manner in which [the person] performed [the person's] responsibilities no longer has the interest necessary to justify the *New York Times* rule. But here, the management of the [recreation area] was still a matter of lively public interest; propositions for further change were abroad, and public interest in the way in which the prior administration had done its task continued strong. The [publication], if it referred to [the plaintiff], referred to [the plaintiff's] performance of duty as a county employee.

*Id.* at 87 n.14.

¶56 Therefore, based on these statements in *Rosenblatt*, the fact that Plaintiff Wagner is retired would not be dispositive of his status as a "public official." *See id.* Instead, his status would depend on whether WKOW's publication referred to his conduct and performance as a public official and whether public interest in his official conduct remained high. *See id.*[13]

¶57 In *Lewis*, 127 Wis. 2d 105, however, our supreme court rejected the notion that a former state legislator who had been out of office for three years continued to qualify as a public official following his retirement. The defamatory broadcast at issue in *Lewis* conflated the former state legislator with another individual who had nearly the same name and had been accused of participating in an extortion conspiracy. *Id.* at 109. In dismissing the broadcast company's argument that Lewis was a public official, our supreme court did not refer to any

---

[13] Other jurisdictions have followed *Rosenblatt* with respect to former public officials, and have concluded that a former public official "remains a public official within the meaning of *New York Times*" "[i]f the defamatory remarks relate to [the person's] conduct while [the person] was a public official and the manner in which [the person] performed [their] responsibilities is still a matter of public interest." *Revell v. Hoffman*, 309 F.3d 1228, 1232-33 (10th Cir. 2002) (quoting *Gray*, 656 F.2d at 591 n.3 (citing *Rosenblatt*, 383 U.S. at 87 n.14)); *see also Pierce v. Capital Cities Commc'ns, Inc.*, 576 F.2d 495, 509-10 (3d Cir. 1978); *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1069-70 (5th Cir. 1987) (former public officials were public officials for purposes of article that was published almost six years after the officials lost their jobs, but that concerned their activities while still in office); *Milgroom v. News Group Boston, Inc.*, 586 N.E.2d 985, 986-87 (Mass. 1992) (former judge remained public official "as to her conduct during her judicial tenure, at least with respect to matters involving the administration of justice, a subject of continuing public interest"); *Varner v. Bryan*, 440 S.E.2d 295, 299 (N.C. Ct. App. 1994) (a former town manager remained a public official because "[u]ndoubtedly, a public official's job performance will often continue to be the subject of important public debate and discussion long after the termination of [their] employment in a public office," and "*Rosenblatt*'s extension of 'public official' status beyond the duration of an official's employment is consistent with the *New York Times* policy favoring robust and open debate of public issues").

United States Supreme Court precedent, or any other precedent on this topic. It summarily stated that it was "clear" that "Lewis [was] not a 'public official'" and "ha[d] not been a 'public official' since he resigned from his assembly office." *Id.* at 115. The court drew no distinction between defamatory broadcasts that related in some way to the former legislator's conduct in office and those that did not.[14]

¶58 Likewise, in *Biskupic*, we stated, without reference to any precedent aside from *Lewis*, that the former district attorney of Outagamie County and former candidate for state attorney general could not be considered a "public official." *Biskupic*, 313 Wis. 2d 225, ¶¶18-19. In *Biskupic*, the defamatory statement at issue misidentified a former district attorney, Vincent Biskupic, as another individual who had been the district attorney of a different county and had been "convicted of accepting bribes to dismiss cases." *Id.*, ¶5 (citation omitted). Relying on *Lewis*, we stated that "Biskupic was a public official until January 2003, when his term as district attorney ended." *Id.*, ¶18. Like the *Lewis* court, we drew no distinction between former public officials who sue over defamatory statements concerning their conduct while in office, and those who sue over defamatory statements concerning other matters.[15]

---

[14] After determining that Lewis was no longer a public official due to his retirement, our supreme court went on to conclude that he was a general purpose public figure who was required to allege actual malice because his conduct in office had garnered him general fame and notoriety. *Lewis v. Coursolle Broad. of Wis., Inc.*, 127 Wis. 2d 105, 115-16, 377 N.W.2d 166 (1985) (explaining that Lewis was not simply a public official who served in office for a time and then left "to drift quietly into oblivion").

[15] Taking an approach similar to that used in *Lewis*, we concluded that Biskupic had become a general purpose public figure who was required to allege actual malice due to his own controversial conduct in office that remained a matter of lively debate among the public. *Biskupic v. Cicero*, 2008 WI App 117, ¶¶24-26, 313 Wis. 2d 225, 756 N.W.2d 649.

¶59 In sum, *Lewis* and *Biskupic* appear to be inconsistent with *Rosenblatt*, which rejected the notion that a public official necessarily sheds the public officer status upon leaving office. Under *Rosenblatt*, Plaintiff Wagner may arguably qualify as a public official for purposes of the news reports, despite his retirement, because the reports addressed his conduct as a law enforcement officer. However, under *Lewis* and *Biskupic*, Plaintiff Wagner decidedly does not qualify as a public official. And, pursuant to *Cook*, 208 Wis. 2d at 189, we are bound to follow *Lewis* and *Biskupic*. *See also Zarder*, 324 Wis. 2d 325, ¶58 (the court of appeals cannot dismiss a statement in a prior Wisconsin Supreme Court opinion as dictum). To the extent that those cases appear to be inconsistent with *Rosenblatt*, it would be up to our supreme court to resolve the conflict.

### b. Public Figure

¶60 As mentioned, "public figures" are also required to prove actual malice in defamation claims against media defendants. "Public figures" are individuals who are not "public officials," but in whom the public has a justified and important interest for at least some purposes. *See Biskupic*, 313 Wis. 2d 225, ¶15 (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974)); *Lewis*, 127 Wis. 2d at 113. "An individual may be deemed a 'public figure' plaintiff for 'general' or 'limited' purposes[.]" *Sidoff*, 409 Wis. 2d 186, ¶15.

¶61 A "general purpose public figure" is "a well-known 'celebrity'" whose name is a "'household word'" and "whose words and deeds are followed by the public" because the public regards the person's "'ideas, conduct, or judgment as worthy of its attention.'" *Wiegel v. Capital Times Co.*, 145 Wis. 2d 71, 82, 426 N.W.2d 43 (Ct. App. 1988) (citation omitted); *see also Lewis*, 127 Wis. 2d at

114-15 (using the phrase "public figure for all purposes" to describe this concept). WKOW does not argue that Plaintiff Wagner is a general purpose public figure.

¶62      "Limited purpose public figures," by contrast, are persons who are "not generally famous or notorious," but who have nonetheless "become public figures for a 'limited purpose' because of their involvement in a particular public controversy." *Sidoff*, 409 Wis. 2d 186, ¶16 (citation omitted); *see also Wiegel*, 145 Wis. 2d at 82; *Bay View Packing Co. v. Taff*, 198 Wis. 2d 653, 676, 543 N.W.2d 522 (Ct. App. 1995); *Erdmann v. SF Broad. of Green Bay, Inc.*, 229 Wis. 2d 156, 165, 599 N.W.2d 1 (Ct. App. 1999). A person may become a public figure with respect to a limited public controversy either because the person voluntarily injected themselves into it, or "because the person's activities 'almost inevitably' 'thrust the person into a central role in a controversy.'" *Sidoff*, 409 Wis. 2d 186, ¶16 (citing *Wiegel*, 145 Wis. 2d at 85-86; *Erdmann*, 229 Wis. 2d at 164).

¶63      To determine whether a plaintiff can be deemed a limited purpose public figure, courts apply a two-prong test that considers the existence of a public controversy and the nature of the plaintiff's involvement in that controversy. *See Denny*, 106 Wis. 2d at 649-50; *see also Sidoff*, 409 Wis. 2d 186, ¶17; *Bay View Packing Co.*, 198 Wis. 2d at 677-78.

¶64      Under *Denny*'s first prong, a controversy is "public" if it is the subject of real public dispute and its outcome affects at least some segment of the general public in an appreciable way. *Bay View Packing Co.*, 198 Wis. 2d at 679; *see also Maguire v. Journal Sentinel, Inc.*, 232 Wis. 2d 236, 245-46, 605 N.W.2d 881 (Ct. App. 1999).

¶65     Then, in considering the nature of the plaintiff's involvement in the public controversy under **Denny**'s second prong, we apply a three-step analysis in which we:  (1) isolate the public controversy with respect to the allegedly defamatory statements at issue, (2) "examin[e] the plaintiff's role in the controversy to be sure that it is more than trivial or tangential," and (3) "determine[] if the alleged defamation was germane to the plaintiff's participation in the controversy." **Bay View Packing Co.**, 198 Wis. 2d at 678-81, 678 n.6 (citing **Van Straten v. Milwaukee J. Newspaper-Publisher**, 151 Wis. 2d 905, 913-14, 447 N.W.2d 105 (Ct. App. 1989) (citing **Wiegel**, 145 Wis. 2d at 82-83 (establishing this three-step analysis for **Denny**'s second prong))).  Each step entails various considerations that we need not discuss at length here.  *See, e.g.*, **Bay View Packing Co.**, 198 Wis. 2d at 680-85.  For purposes of our discussion, it suffices to say that public controversies "can be both 'broad' and 'narrow' in scope," *id.* at 680-81, and that the focus of the analysis is on objective facts about the plaintiff's "role in the public controversy, 'rather than on any desire for publicity or other voluntary act' on their part," *id.* at 683 (citing **Wiegel**, 145 Wis. 2d at 85).

¶66     Whether the plaintiff is a limited purpose public figure presents a question of law.  **Sidoff**, 409 Wis. 2d 186, ¶19.  However, it can also be a fact-intensive inquiry that is shaped in large part by extrinsic evidence concerning the existence and scope of a preexisting public controversy.  *See id.*, ¶¶22-25, 27-28 (considering on summary judgment facts that included the extensive media coverage and public interest in a murder that preceded the publication of the allegedly defamatory book); **Denny**, 106 Wis. 2d at 647, 651 (considering on summary judgment the lack of news coverage that preceded the allegedly defamatory news report); **Wiegel**, 145 Wis. 2d at 73-75 (considering on summary

33

judgment the news reports that preceded the allegedly defamatory editorial); ***Bay View Packing Co.***, 198 Wis. 2d at 663-65, 679-81 (considering on summary judgment the timeline and news coverage leading up to the allegedly defamatory news report for purposes of defining the public controversy and subcontroversy at issue); ***Erdmann***, 229 Wis. 2d at 160-61 (considering on summary judgment the police investigation and public news conference announcing a manhunt that preceded the allegedly defamatory news report). Because this determination may require a court to consider matters extrinsic to the pleadings, it is not always readily amenable to resolution through a motion to dismiss or for judgment on the pleadings.[16]

¶67     Here, as stated above, the circuit court limited its review to the complaint, the answer, and the incorporated news reports, which, again, consisted solely of the recording of the 6 p.m. broadcast and the copy of the online article. The incorporated news reports expressly addressed law enforcement's use of force in the Wilson shooting, and they also expressly addressed Plaintiff Wagner's role in the 2002 Pundsack incident and the related inquest hearing in 2003 about Plaintiff Wagner's use of force in that incident. Although WKOW asked the court to take judicial notice of numerous media articles that were published between 2001 and 2022 that pertained to police shootings, the court declined to consider these articles in its analysis of WKOW's motion for judgment on the pleadings.[17]

---

[16] *See, e.g.*, ***Sidoff***, 409 Wis. 2d 186, ¶19 (when material factual disputes arise, the court should resolve the factual disputes prior to trial, after an evidentiary hearing on the issue if necessary, and then rule on the plaintiff's status as a matter of law).

[17] Some of the articles that the circuit court declined to take judicial notice of addressed the Wilson shooting. Others specifically addressed the Pundsack shooting, the subsequent inquest hearing, and the City of Milwaukee's settlement with the Pundsack family. Yet another

(continued)

¶68 Based solely on the complaint, answer, and incorporated news reports, the circuit court determined that Plaintiff Wagner was not a limited purpose public figure. The court appeared to acknowledge that officer-involved shootings in general, and the Wilson shooting in particular, generate public controversy. Yet the court reasoned that Plaintiff Wagner was not actually involved in the Wilson shooting; therefore, citing *Gertz*, 418 U.S. at 352, and *Bay View Packing Co.*, 198 Wis. 2d at 678, 682, the court determined that Plaintiff Wagner's role was "trivial or tangential" because he "plainly did not thrust himself into the vortex of this public issue" or "engage the public's attention in an attempt to influence its outcome."

¶69 We question at least two aspects of the circuit court's rationale, and whether they are consistent with our case law. First, Wisconsin cases have moved away from the notion that a person must voluntarily "thrust himself into the vortex of [a] public issue" in an "attempt to influence its outcome" in order to be considered a limited purpose public figure. *Gertz*, 418 U.S. at 352; *Sidoff*, 409 Wis. 2d 186, ¶16 (citing *Wiegel*, 145 Wis. 2d at 85-86); *Erdmann*, 229 Wis. 2d at 169 ("we can find no support for [the plaintiff's] claim that limited [purpose public figure] status cannot be created without purposeful or voluntary conduct by the individual involved"); *Bay View Packing Co.*, 198 Wis. 2d at 682-83 ("[p]ersons can become involved in public controversies and affairs without their consent or will" through "sheer bad luck" (citing *Wiegel*, 145 Wis. 2d at 86)). Instead, our cases recognize that a person's activities may inevitably—albeit

_____

article, published after the murder of George Floyd in Minneapolis in 2020, identified 18 fatal police shootings in southeastern Wisconsin, including the Pundsack shooting, in which the law enforcement officers who fired the fatal shots were never criminally charged for those deaths.

involuntarily—place the person in the center of a public controversy, thereby rendering them a limited purpose public figure. *See Sidoff*, 409 Wis. 2d 186, ¶16 (citing *Wiegel*, 145 Wis. 2d at 85-86; *Erdmann*, 229 Wis. 2d at 164).

¶70 Second, the court appeared to limit its analysis to Plaintiff Wagner's role (or, more accurately, his lack of a role) in the Wilson shooting. However, it is not evident that this limited focus properly accounted for the subject and scope of the preexisting public controversy in which Plaintiff Wagner was involved. As discussed at length above, WKOW's allegedly defamatory news reports not only addressed the Wilson shooting in 2022, but they also addressed the public controversy over Plaintiff Wagner's role in the Pundsack shooting in 2002 and a link that WKOW identified (albeit inaccurately) between those two events. To the extent that the court confined its analysis to Plaintiff Wagner's role in the Wilson shooting, the circuit court may have defined the subject and scope of the public controversy in too limited a fashion. By way of example, although the court did not consider the media articles that WKOW provided when defining the subject and scope of the public controversy pertinent to this case, those articles suggest ongoing public discourse about police shootings of unarmed persons, including incidents that took place decades ago, and public discourse on the topic of accountability for officers who are involved in such incidents. *See, e.g.*, *Bay View Packing Co.*, 198 Wis. 2d at 680-81 (explaining that controversies can be both broad and narrow in scope, and that the breadth at which a controversy is defined will influence an analysis of the plaintiff's role in the controversy).

¶71 We agree with the circuit court in that the complaint, answer, and incorporated news reports do not conclusively establish that Plaintiff Wagner is a limited purpose public figure. Based on the limited record established by the pleadings and incorporated news reports, we cannot say that the court's ultimate

conclusion—that Plaintiff Wagner is not a limited purpose public figure—is wrong. Therefore, the court did not err when it declined to dismiss Plaintiff Wagner's defamation claim based on his failure to allege actual malice.[18]

¶72 However, unlike the circuit court, we also conclude that the pleadings and incorporated news reports do not conclusively establish that Plaintiff Wagner is *not* a limited purpose public figure. As we have explained, we have reservations about the court's stated rationale for its conclusion, which it made without giving the parties an opportunity to develop the record with extrinsic evidence pertinent to the existence and scope of any preexisting public controversies or Plaintiff Wagner's role in any such controversy. The evidence of a preexisting public controversy in this record is limited to WKOW's allegedly defamatory news reports themselves, and a defamatory news report cannot create a controversy where none previously existed. *Id.* at 682 (citing ***Hutchinson v. Proxmire***, 443 U.S. 111, 135 (1979)). To be sure, the news reports allude to a preexisting public controversy over the Pundsack shooting, but the limited record on appeal would not even allow us to speculate as to the scope and extent of public controversy on that topic.

¶73 In sum, we agree with the circuit court that, at this stage of the proceedings, Plaintiff Wagner was not required to allege actual malice to state a claim for defamation against WKOW. However, nothing we say in this opinion should be read to preclude WKOW from raising the issue of Plaintiff Wagner's status and the actual malice requirement again in a subsequent motion. Nor should

---

[18] On appeal, Plaintiff Wagner does not contend that the facts in the complaint plausibly allege actual malice and we do no address that issue.

anything in this opinion be read to foreclose the court from concluding, on a more developed record, that WKOW is entitled to judgment based on Plaintiff Wagner's inability to show that that standard is met.

## 2. Negligent Publication of Defamatory Statements

¶74 In the alternative, WKOW argues that, even if Plaintiff Wagner is not a public individual required to allege actual malice, Plaintiff Wagner still must allege that WKOW was negligent when it published the defamatory news reports, and that he fails to do so in his complaint. We disagree.

¶75 As noted, to establish liability and to recover actual damages, a private individual must prove that a media defendant was negligent when it published a defamatory falsehood. *Denny*, 106 Wis. 2d at 654, 657-58. This requires proof that the media defendant failed to exercise reasonable care. *See **id.*** at 656.

¶76 Here, the complaint alleges that WKOW "did not have a reasonable basis for" its news reports and "failed to use the required ordinary care in checking on the identity of DCI Agent Mark Wagner before running the story." The complaint further alleges that WKOW could have sought confirmation that Plaintiff Wagner, who was formerly employed as a Milwaukee police sergeant and involved in the Pundsack shooting, was the same "Mark Wagner" as the DCI Agent who WKOW identified as having discharged his weapon in the Wilson incident. Finally, the complaint alleges, upon information and belief, that WKOW "ran the false story at least once even after having received notice of their false reporting."

¶77 WKOW argues that these allegations, even if true, are insufficient to allow a jury to find that it failed to exercise reasonable care. It contends that "requiring WKOW to investigate whether there [was] more than one former Milwaukee police officer[] named Mark Wagner would require more than just ordinary, reasonable care and is not a basis for defamation liability."[19]

¶78 We disagree. Generally speaking, the question of whether a defendant exercised ordinary care should be resolved by a jury; courts should decide such questions pretrial as a matter of law only in rare circumstances. *Rockweit v. Senecal*, 197 Wis. 2d 409, 419, 541 N.W.2d 742 (1995). WKOW does not persuade us that this is one of those rare circumstances in which no jury could reasonably find that it failed to exercise ordinary care. Therefore, to the extent that negligence is the degree of fault that is applicable to Plaintiff Wagner's defamation claim, we conclude that WKOW's alternative argument does not provide a basis for its dismissal.

## II. Claim for Common Law Negligence

¶79 As a final matter, we address the circuit court's dismissal of Plaintiff Wagner's negligence claim. To be clear, it is not at all apparent that the complaint attempts to allege a standalone claim for negligence that is separate and distinct

---

[19] WKOW cites *Lake Havasu Estates, Inc. v. Reader's Digest Ass'n, Inc.*, 441 F. Supp. 489, 490 (S.D.N.Y. 1977), for the proposition that publishers have "no duty … to check to see whether other companies existed which bore the same name as the subject of its article." WKOW's citation to the *Lake Havasu Estates* case is inapt, not only because it addresses the common law negligence standards of a state other than Wisconsin without showing a tie to Wisconsin law, but also because its facts do not involve a situation in which a publisher misidentified the subject of its report and inaccurately conflated the identities of persons or entities with similar names.

from Plaintiff Wagner's defamation claim. Nor does Plaintiff Wagner robustly argue in favor of a standalone claim in his appellate briefing. As we understand it, Plaintiff Wagner has addressed Wisconsin's common law negligence standards in the circuit court and on appeal because, as just discussed, negligence is the degree of fault that he contends is necessary to prove WKOW's liability for purposes of this defamation claim. *See Denny*, 106 Wis. 2d at 654, 657-58.

¶80 Putting these observations aside, to the extent that Plaintiff Wagner means to allege a claim for negligence that is separate and distinct from his defamation claim, we agree with the circuit court that any such claim should be dismissed. WKOW argues that any standalone negligence claim would be "simply a defamation claim in new attire," and that a plaintiff cannot avoid the constitutional protections that are afforded to media defendants in defamation actions by labeling their defamation claim as a negligence claim. Plaintiff Wagner does not counter this argument, and we see no reason to disagree with WKOW. If negligence is the degree of fault applicable to Plaintiff Wagner's defamation claim, Plaintiff Wagner does not identify any benefit of maintaining two causes of action that are entirely duplicative, one for defamation and another for negligence. In failing to identify any benefit, he fails to develop an argument. *See State v. Pettit*, 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992) (declining to develop arguments on behalf of parties). Alternatively, to the extent that the actual malice standard is later determined to apply to protect WKOW's constitutional rights, Plaintiff Wagner cannot circumvent those constitutional

standards by labeling his claim as a cause of action for negligence rather than as one for defamation.[20]

¶81    In sum, Plaintiff Wagner does not develop an argument that he has stated a standalone claim for negligence. We therefore affirm the dismissal of any such claim he may intend to make.

## CONCLUSION

¶82    For the foregoing reasons, the circuit court's judgment is affirmed with respect to the dismissal of any standalone negligence claim that Plaintiff Wagner may intend to make, and it is reversed with respect to the dismissal of the defamation claim.

*By the Court.—*Order affirmed in part and reversed in part.

---

[20] *See **Van Straten v. Milwaukee J. Newspaper-Publisher***, 151 Wis. 2d 905, 921, 447 N.W.2d 105 (Ct. App. 1989) (citing ***Goldman v. Time, Inc.***, 336 F. Supp. 133, 137-38 (N.D. Cal. 1971) for the proposition that a "plaintiff cannot avoid the impact of the ***New York Times*** rule merely by labeling his action as one for invasion of privacy rather than libel"); *see also* ***Khodorkovskaya v. Gay***, 5 F.4th 80, 85 (D.C. Cir. 2021) (applying First Amendment protections for defamation claims to a false light claim and citing other cases applying the same constitutional protections to claims of intentional infliction of emotional distress).